**ULTRAPURE SYSTEMS, INC., Plaintiff,**

**v.**

**HAM–LET GROUP, et al., Defendants.**

**Civil No. 95–20706 SW.**

United States District Court,
N.D. California.

Jan. 3, 1996.

Thomas N. Makris, David H. Jaffer and Emily Prescott of Rosenblum, Parich and Isaacs, San Fransisco, CA, for Plaintiff Ultrapure Systems, Inc.

Paul H. Goldstein and Stephen Debenham of Jackson, Tufts, Cole and Black, San Jose, CA, for Defendants HAM–LET Ltd., HTC Ltd., and HT Components, Inc.

Sheldon R. Meyer, Larry E. Vierra, Burt Magen of Fliesler, Dubb, Meyer & Lovejoy, San Fransisco, CA, and Stephen Loquaci, San Jose, CA, for Defendant Kinetic Systems, Inc.

ORDER DENYING ULTRAPURE'S APPLICATION FOR PRELIMINARY INJUNCTION BASED ON TRADEMARK INFRINGEMENT; SETTING EVIDENTIARY HEARING ON UNFAIR BUSINESS PRACTICE CLAIM; DENYING DEFENDANTS' MOTION TO DISMISS COUNTS ONE AND SEVEN OF THE COMPLAINT

SPENCER WILLIAMS, District Judge.

Plaintiff Ultrapure Systems, Inc. ("Ultrapure") brought this action against Defendants HAM–LET Group, Ltd. ("HAM–LET"), HTC Ltd. ("HTC"), Hi–Tech Components, Inc., Kinetic Systems, Inc. ("Kinetic"), High Purity Supplies, Inc. ("High Purity"), and Components Gaz Microelectronique Internationale ("CGMI") for trademark infringement, false designation of origin, unfair competition, breach of contract, and interference with business relations. In its motion, Ultrapure applies for a preliminary injunction to prohibit Defendants from using the mark GAZLINE or selling GAZLINE fittings in the United States. In response, Defendants move to dismiss Ultrapure's claims for trademark infringement and breach of contract. For the reasons set forth below, the Court DENIES Ultrapure's application for a preliminary injunction based on trademark infringement, ORDERS an evidentiary hearing on the unfair competition claim and DENIES Defendants' motion to dismiss counts one and seven of Ultrapure's complaint.

## BACKGROUND

Ultrapure, a U.S. company, manufactures and distributes metal gasket couplings ("fittings") for gas circulation systems used in the microelectronics industry. Ultrapure manufactures and distributes these fittings in the U.S. under an exclusive license from a French company, Components Gaz Microelectronique Internationale (CGMI), who owns the registered trademark "GAZEL." The license with CGMI grants Ultrapure the use of CGMI patents, brands, trademarks and technology in connection with the manufacture and distribution of GAZEL fittings in the U.S. and Asia.

In 1990, Defendant HAM–LET Group, an Israeli company, entered into a similar licensing agreement with CGMI that covered the manufacturing and distribution of GAZEL fittings in Israel and South Africa. The licensing agreement prohibits HAM–LET from using the CGMI designs outside of Israel and South Africa. Utilizing the technology and trademark it acquired in this licensing agreement, HAM–LET entered the fittings market in Israel and South Africa in 1990.

According to HAM–LET, it discovered that the technology obtained from CGMI was

inadequate for the purpose of manufacturing high quality fittings. Consequently, HAM–LET decided to develop its own line of high quality fittings so that it could compete in selling to customers with ultra-high purity gas delivery systems.

HAM–LET alleges that in July of 1992, it stopped manufacturing the GAZEL fittings. HTC, a company with the same ownership as HAM–LET, then spent two years developing a new line of fittings. About August of 1994, HTC began to sell its fittings in the U.S. under the brand name "GAZLINE" through distributors Kinetic and High Purity.

Ultrapure disputes the assertion that HTC developed its own line of fittings and alleges that the only difference between GAZLINE fittings and GAZEL fittings is the name. Consequently, Ultrapure filed the present action for trademark infringement, false designation of origin, unfair competition, breach of contract, and interference with business relations.

## I. ULTRAPURE'S APPLICATION FOR A PRELIMINARY INJUNCTION

Ultrapure alleges that it is entitled to a preliminary injunction on two grounds. First, Ultrapure asserts that Defendants are infringing on the GAZEL trademark by selling identical goods under a confusingly similar mark. Second, Ultrapure contends that Defendants are engaging in unfair competition because they are violating the licensing agreements by selling GAZLINE fittings in the U.S.

### LEGAL STANDARD

A district court may issue a preliminary injunction when the moving party demonstrates either "(1) a combination of probable success on the merits and the possibility of irreparable injury or (2) that serious questions are raised and the balance of hardships tips sharply in its favor." *Arcamuzi v. Continental Air Lines, Inc.*, 819 F.2d 935, 937 (9th Cir.1987); *Los Angeles Memorial Coliseum Comm'n v. National Football League*, 634 F.2d 1197, 1201 (9th Cir.1980). "These

formulations are not different tests but represent two points on a sliding scale in which the degree of irreparable harm increases as the probability of success on the merits decreases." *Big Country Foods, Inc. v. Board of Educ. of the Anchorage School District*, 868 F.2d 1085, 1088 (9th Cir.1989).

### A. Trademark Infringement: Likelihood of Confusion [1]

For Ultrapure to prevail on its application for a preliminary injunction it must establish at least a fair chance of success on the merits. In a trademark infringement claim, a plaintiff is likely to succeed on the merits if the plaintiff can establish that the defendant's use of its mark gives rise to a "likelihood of confusion" in the consuming public. *Metro Pub. Ltd. v. San Jose Mercury News*, 987 F.2d 637, 640 (9th Cir.1993); *E. & J. Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280, 1290 (9th Cir.1992). A likelihood of confusion exists when consumers are apt to assume that a product or service is associated with a source other than its actual source due to similarities between the two sources' marks or marketing techniques. *Metro*, 987 F.2d at 640; *Nutri/System, Inc. v. Con–Stan Indus., Inc.*, 809 F.2d 601, 604 (9th Cir.1987).

The Ninth Circuit has developed an eight factor test to determine whether a substantial likelihood of confusion exists in a trademark case: 1) strength of the allegedly infringed mark; 2) proximity or relatedness of the goods; 3) similarity of the sight, sound and meaning of the marks; 4) evidence of actual confusion; 5) degree to which marketing channels converge; 6) type of goods and degree of care consumers are likely to exercise in purchasing the products; 7) intent of the defendant in selecting the allegedly infringing mark, and; 8) likelihood that the parties will expand their product lines to compete with each other. *Gallo*, 967 F.2d at 1290. Each factor is not necessarily relevant to every case and this list of factors is "neither exhaustive nor exclusive." *Id.*

---

**1.** Initially, it is important to note that Ultrapure is not entitled to a preliminary injunction regarding the trademark unless it has standing to en-

force the GAZEL mark. As set forth in section II of this Order, Ultrapure does have standing to enforce the GAZEL mark.

### 1. *Strength of the Mark*

Trademark law offers greater protection to marks that are strong or distinctive, as opposed to those that are weak or commonplace. The strength or weakness of a mark is determined by its placement on a continuum of marks from "generic", afforded no protection through "descriptive" or "suggestive", given moderate protection, to "arbitrary" or "fanciful", awarded maximum protection. *E. & J. Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280, 1291 (9th Cir. 1992); *Nutri/System, Inc. v. Con–Stan Industries, Inc.*, 809 F.2d 601, 605 (9th Cir. 1987). Among the weaker marks, a descriptive mark specifically describes a characteristic or ingredient of an article or service, *see e.g., Park 'N Fly, Inc. v. Dollar Park and Fly, Inc.*, 782 F.2d 1508 (9th Cir.1986) ("*Park 'N Fly*"), while a suggestive mark merely implies an ingredient, quality or characteristic. *See e.g., AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341 (9th Cir.1979) ("*Sleekcraft*"). In other words, a mark is descriptive if it conveys an immediate idea of the characteristics of the goods, while a mark is suggestive if it requires imagination, thought and perception to reach a conclusion as to the nature of the goods. *McGregor–Doniger, Inc. v. Drizzle, Inc.*, 446 F.Supp. 160, 162–63 (S.D.N.Y.1978).

Here, the trademark "GAZEL" deserves moderate protection. "Gaz" is the French word for "gas" and CGMI, licensor of the trademark, is a French corporation. Therefore, the mark implies the purpose of the product. However, the strength of the mark is furthered by its association with an animal, the gazelle, which has no relation to any attribute of the product. Thus, the mark is suggestive and warrants moderate protection.

### 2. *Proximity of the Goods*

Where goods are related or complementary, the danger of consumer confusion is heightened. *Gallo*, 967 F.2d at 1291. To be related, goods do not have to be identical. Rather, they must only be "reasonably thought by the buying public to come from the same source if sold under the same mark." *AMF*, 599 F.2d at 350.

Here, both the GAZEL and GAZLINE product lines consist of gas circulation fittings. Although HTC alleges that GAZLINE fittings are of higher quality than GAZEL fittings, this distinction does not support the conclusion that the products are unrelated. Therefore, considering the similar uses and appearance of the fittings, it is apparent the products are related.

### 3. *Similarity of the Marks*

"Similarity of the marks is tested on three levels: sight, sound, and meaning." *AMF*, 599 F.2d at 351. The marks, GAZEL and GAZLINE, are only slightly similar in sound. While they both incorporate "gaz" the French and Hebrew word for gas, when the words are considered in their entirety the differences in sound are evident. As for sight, the logos associated with these marks are different. The GAZEL logo depicts a gazelle head coming from the "G", while the GAZLINE logo has an image of piping intertwined with the lettering. Additionally, the meanings are different. While GAZLINE indicates a line for transporting gas, GAZEL only incorporates "gaz" and suggests an animal. Thus, the marks have noticeable differences.

### 4. *Actual Confusion*

Ultrapure offers evidence that several people approached its booth at a trade show and displayed confusion regarding the source of the GAZEL fittings. For example, Ultrapure asserts that people approached Ultrapure's booth at the trade show and asked, "Is that the Israel-made fitting?" and "Are those fittings made in Israel?" HTC objects to this evidence as hearsay. However, these statements are not hearsay because the statements are not offered for the truth of the matter (i.e. that the fittings are made in Israel). Instead, these statements are used to show that people at the trade show asked questions regarding the source of the GAZEL fittings. Thus, Ultrapure's declarations are admissible.

However, the statements at the trade show must be viewed in context. The circumstances surrounding the statements and motivations of the speakers is unclear. Fur-

ther, confusion of some people at trade shows does not necessarily demonstrate that purchasers are confused. In sum, Ultrapure has offered some evidence of actual confusion but the evidence is weak.

### 5. *Type of Goods and Degree of Care of Consumers*

Gas circulation fittings are specialized goods and it is undisputed that purchasers of the product are sophisticated. Additionally, the fittings are expensive and scrutinized by microelectronics companies to insure purity in their gas distribution systems. Further, the number of suppliers is small and well known by the market. Thus, it is evident that buyers in the market exercise a high degree of care.

### 6. *Intent of Defendants*

Ultrapure asserts that HTC could have chosen any mark but adopted a mark similar to GAZEL. According to Ultrapure, since HAM–LET formerly sold GAZEL fittings, use of the GAZLINE mark indicates an intent to confuse buyers.

In response, HTC contends that it adopted the name because "gaz" means "gas" in French and Hebrew and because HAM–LET sells other products with "line" in the brand names (pipeline and weldline). Additionally, HTC alleges that its products are superior to Ultrapure's and therefore, it does not want the two product lines to be confused. Although it is difficult to determine HTC's intent on selecting the mark of "GAZLINE," HTC's explanations effectively rebut Ultrapure's allegation that HTC intended to confuse purchasers.

### CONCLUSION

In weighing all the factors, Ultrapure has not demonstrated a likelihood of confusion in the consuming public. Although the GAZEL mark warrants moderate protection and the GAZLINE and GAZEL fittings are related products, the marks are not confusingly similar. Further, buyers in the industry are knowledgeable and exercise a high degree of care in purchasing fittings. Thus, Ultrapure has not adequately established a likelihood of success on the merits.

Additionally, Ultrapure has not made a showing of irreparable harm if the injunction is not issued. Ultrapure alleges that it will lose sales and miss the window of opportunity that currently exists in a rapidly expanding gas fittings industry. However, Ultrapure also admits that it is a small player in the market and that it has not established itself as a manufacturer of high quality fittings. Further, Ultrapure does not contend that Defendants' actions are injuring Ultrapure's reputation or causing a loss of goodwill. In fact, it is possible that GAZLINE fittings are superior to GAZEL fittings and thus, any confusion between the products will not impair Ultrapure's standing in the industry.

In sum, Ultrapure has failed to establish either a likelihood of success on the merits on its trademark infringement claim or the possibility of irreparable harm if the preliminary injunction is not issued. Accordingly, Ultrapure's application for a preliminary injunction on the basis of trademark infringement is DENIED.

### B. Unfair Competition: The Licensing Agreements

California Bus. and Prof.Code § 17203 prohibits unfair business practices and permits courts to enjoin any unlawful business acts and award restitutionary damages. Unlawful acts include any business practice that is determined to be unlawful, unfair, or fraudulent. Cal.Bus. & Prof.Code § 17200.

Ultrapure alleges that Defendants are committing an unlawful business practice by selling fittings in violation of CGMI licensing agreements. Under its licensing agreement with CGMI, Ultrapure is the exclusive manufacturer of GAZEL fittings in the United States. According to Ultrapure, HAM–LET obtained technology and other trade secrets from CGMI and used this information to set up HTC and manufacture the GAZLINE fittings currently sold in the U.S.

In response, HTC asserts that the GAZLINE fittings are not GAZEL fittings, but were developed by HTC through its own research. According HTC, HAM–LET stopped producing GAZEL fittings in 1992 and none of the information obtained from CGMI by HAM–LET was used by HTC to

develop and manufacture the GAZLINE fittings. Thus, HTC contends that selling GAZLINE fittings in the U.S. is neither a violation of the licensing agreements nor an unfair business practice.

Both sides submitted numerous declarations on the similarity or dissimilarity of the GAZLINE and GAZEL fittings. However, these declarations do not provide an adequate basis for determining whether Defendants are violating the CGMI licensing agreements by selling the GAZLINE fittings. Thus, the Court ORDERS an evidentiary hearing on the issue of whether the GAZLINE fittings are actually GAZEL fittings with a different name. The hearing will be held in San Jose on February 7, 1996, at 10:00 a.m.

## II. Defendants' Motion to Dismiss Counts One and Seven of the Complaint

Defendants move to dismiss Ultrapure's claims for trademark infringement (count one of Ultrapure's complaint) and breach of contract (count seven). Defendants allege that Ultrapure, as a licensee, does not have standing to assert a claim for trademark infringement. Further, HAM–LET asserts that it cannot be held liable for breach of contract when the alleged unlawful conduct was committed by another entity, HTC.

## LEGAL STANDARD

Under the liberal federal pleading policies, a plaintiff need only give defendant fair notice of the claims against it. *Conley v. Gibson,* 355 U.S. 41, 47, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957). A complaint should only be dismissed where, assuming all allegations as true in the light most favorable to plaintiff, it appears beyond doubt that no set of facts could support plaintiff's claim for relief. *Id.; Durning v. First Boston Corp.,* 815 F.2d 1265, 1267 (9th Cir.1987), *cert. denied,* 484 U.S. 944, 108 S.Ct. 330, 98 L.Ed.2d 358 (1987).

**2.** Ultrapure informed CGMI of the alleged trademark and licensing violations but CGMI was reluctant to get involved. Thus, in the com-

### A. Trademark Infringement Standing

Title 15 U.S.C. § 1114 permits civil actions for trademark infringement to be brought by the "registrant" of the mark. The term registrant includes the legal representatives, predecessors, successors, and assigns of the registrant. 15 U.S.C. § 1127.

Here, CGMI, is the registrant of the GAZEL mark. Thus, any rights that Ultrapure has in the mark derive from the rights of CGMI.[2] Originally, CGMI licensed the exclusive use of the GAZEL mark in the U.S. to Aluminum Company of America (ACOA). Thereafter, Ultrapure allegedly acquired the exclusive license to the GAZEL brand in the U.S.

The determination of whether a licensee has standing to sue under § 1114 largely depends on the rights granted to the licensee in the licensing agreement. Where the license is non-exclusive the licensee does not have standing to bring an infringement action. *Quabaug Rubber Co. v. Fabiano Shoe Co.,* 567 F.2d 154, 159–160 (1st Cir. 1977). Also, the licensee lacks standing when provisions in the contract indicate that the licensor retains exclusive ownership of the mark. *DEP Corp. v. Interstate Cigar Co.,* 622 F.2d 621, 623 (2nd Cir.1980). Further, since the rights of the licensee are based upon the rights of the owner or licensor, infringement actions against the owner are generally prohibited. *Silverstar Enterprises, Inc. v. Aday,* 537 F.Supp. 236, 241 (S.D.N.Y.1982); *Shoney's, Inc. v. Schoenbaum,* 686 F.Supp. 554, 563–64 (E.D.Va.1988), *aff'd,* 894 F.2d 92 (4th Cir.1990).

Here, the contract between CGMI and ACOA contains the following provision:

ACOA [Licensee] will have the right to register in the TERRITORY the CGMI brands in CGMI's name but at ACOA's expense. ACOA [Licensee] will have exclusive rights to their use in the TERRITORY for the duration of the contract.

Thus, the contract gives exclusive use of the trademarks in the U.S. to the licensee. Further, the contract does not set forth any

plaint, Ultrapure names CGMI as a defendant so that CGMI is a party to the action.

restrictions on the licensee's ability to enforce the trademarks. Under these circumstances, Ultrapure, as an exclusive licensee, does have a property interest in the trademark and qualifies as an assignee or successor of the registrant. *See Shoney's, Inc.*, 686 F.Supp. at 563; *G.H. Mumm Champagne v. Eastern Wine Corp.*, 142 F.2d 499 (2nd Cir. 1944), *cert. denied*, 323 U.S. 715, 65 S.Ct. 41, 89 L.Ed. 575 (1944); *see also* Jerome Gilson, *Trademark Protection and Practice § 8.16[1][b]*. Therefore, Ultrapure does have standing to enforce the GAZEL mark against Defendants. Accordingly, Defendants' motion to dismiss Ultrapure's infringement claim is DENIED.

### B. Breach of Contract

■ HAM–LET contends that it cannot be held liable for breach of contract because the complaint does not allege a sufficient relationship between HAM–LET and HTC to support a breach of contract theory against HAM–LET. HAM–LET's argument is unpersuasive.

In its complaint, Ultrapure alleges that HTC and HAM–LET are related entities. Although the exact relationship between HTC and HAM–LET is unclear, it is undisputed that the companies have common ownership. Since any confusion about corporate entities can be clarified by HAM–LET, HAM–LET should not be allowed to exploit the fact that Ultrapure does not know the precise nature of the relationship between HAM–LET and HTC. Thus, the Court finds that Ultrapure has sufficiently stated allegations to support its breach of contract claim. Accordingly, HAM–LET's motion to dismiss the breach of contract claim is DENIED.

IT IS SO ORDERED.