**UPPER DECK AUTHENTICATED, LTD., Plaintiff,**

v.

**CPG DIRECT, et al., Defendants.**

**And Related Claims.**

**Civil No. 95–197–BTM(CGA).**

United States District Court, S.D. California.

Jan. 8, 1997.

Paul C. Workman, Vito A. Costanzo, John M. Newell, John T. Shaban, Whitman, Breed, Abbott & Morgan, for Plaintiffs Upper Deck Authenitcated, Ltd. (and related entities).

Dickran A. Semerdjian, Post, Kirby, Noonan & Sweat, George J. Krueger, Blank, Rome, Comisky & McCauley, for Defendant/Counterclaimant/Third–Party Defendant The Score Board, Inc. (and related entities).

Michael K. Brown, Kenneth N. Smersfelt, Crosby, Heafey, Roach & May, for Defendants Shop At Home. Inc. (and related entities).

Dennis J. Oury, Oury & Mizdol, P.C., for Defendants CPG Direct and B & J Collectibles.

## ORDER GRANTING IN PART AND DENYING IN PART MOTIONS FOR SUMMARY JUDGMENT

MOSKOWITZ, District Judge.

### INTRODUCTION

Before the Court are several motions for partial summary judgment. In one motion (the "exclusivity motion"), Defendant/Counterclaimant/Third–Party Plaintiff The Score Board, Inc. ("Score Board")[1] moves for summary judgment on those causes of action in the First Amended Complaint ("FAC") grounded in claimed rights of exclusivity allegedly granted to Plaintiffs Upper Deck Authenticated, Ltd. ("UDA") and The Upper Deck Company ("UDC") (collectively, "Upper Deck"). Although Upper Deck's allegations relate to the "indicia" of six different athletes, Score Board has brought the present exclusivity motion only with respect to the indicia of Mickey Mantle and Joe Montana.

Score Board's other motion (the "authenticity motion") concerns alleged violations of Cal. Civil Code § 1739.7, which governs certificates of authenticity for autographed sports memorabilia. Defendants Shop at Home, Inc. ("Shop at Home"), CPG Direct ("CPG"), and B & J Collectibles ("B & J") have joined in Score Board's authenticity motion.

Based on the briefs, oral argument held on December 16, 1996, and for the reasons stated below, the exclusivity motion is GRANTED and the authenticity motions are DENIED.

### BACKGROUND

This action arises out of disputes between various companies involved in the sports memorabilia business. The two primary parties in this case, Upper Deck and Score Board, sell items bearing the names, likenesses, images and signatures (the "indicia") of numerous famous professional athletes. Most of the remaining Defendants—including Shop at Home, CPG, and B & J—are engaged in similar activities. These companies have athletes autograph baseballs, footballs, hockey sticks, jerseys, and other sports-related items, which are marketed to collectors through various channels of distribution.

Upper Deck's FAC asserts eight separate causes of action against the various Defendants, for: (I) violations of the Lanham Act; (II) misappropriation of the right of publicity; (III) interference with contract; (IV) dilution; (V) unjust enrichment, constructive trust, and accounting; (VI) declaratory relief; (VII) unfair competition; and (VIII) libel and slander. Upper Deck's claims fall into three basic categories. First, Counts I–VII are based on allegations that the Defendants violated Upper Deck's claimed rights of exclusivity by selling sports memorabilia autographed by athletes[2] with whom Upper Deck has or had exclusive contracts. Sec-

---

1. Plaintiffs also have sued a number of present or former affiliates of The Score Board, Inc., including Classic Games, Inc., Catch a Star Collectibles, Inc., Score Board Retail Corporation, and the Score Board Holding Corporation. Where appropriate, all references to "Score Board" in this Order include each of those entities.

2. The athletes at issue are Joe Montana, Mickey Mantle, Michael Jordan, Wayne Gretzky, Ted Williams, and Reggie Jackson.

ond, in Count VII (and also as part of the declaratory relief claim in Count VI) Upper Deck alleges that the Defendants compete unfairly by selling items in violation of California Civil Code § 1739.7, which governs certificates of authenticity for autographed sports memorabilia. Finally, Upper Deck has included in its FAC a libel and slander claim (Count VIII).

Score Board now moves for summary judgment on (1) the portions of Counts I–VII based on alleged violations of Upper Deck's claimed exclusivity rights in the indicia of Mickey Mantle and Joe Montana, and (2) the unfair competition (Count VII) and declaratory relief (Count VI) claims as they relate to authenticity requirements under state law. Shop at Home, CPG, and B & J have joined in Score Board's authenticity motion.

### I. Summary judgment standard

Summary judgment under Fed R. Civ. P. 56(c) is appropriate if the record, read in the light most favorable to the non-moving party, demonstrates no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Bagdadi v. Nazar,* 84 F.3d 1194, 1197 (9th Cir.1996). Material facts are those necessary to the proof or defense of a claim, and are determined by reference to the substantive law. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The court must not weigh the evidence or determine the truth of the matter but only determine whether there is a genuine issue for trial. *See Abdul– Jabbar v. General Motors Corp.,* 85 F.3d 407, 410 (9th Cir.1996).

A district court may continue or deny a motion for summary judgment under Fed R. Civ. P. 56(f) where the party opposing summary judgment demonstrates the possibility that further discovery will raise triable issues of fact. See Fed.R.Civ.P. 56(f); *Conkle v.*

*Jeong,* 73 F.3d 909, 914 (9th Cir.1995); *VISA Int'l Serv. v. Bankcard Holders,* 784 F.2d 1472, 1475 (9th Cir.1986).

### II. The exclusivity motion

As noted above, Score Board's exclusivity motion focuses on one of the two central themes permeating Upper Deck's complaint. In essence, Upper Deck's first through seventh causes of action allege that Score Board, in selling items signed under prior contracts with various athletes, violated Upper Deck's "exclusive rights" to sell the indicia of the athletes. Upper Deck also contends that Score Board's resale of collectibles purchased on the "secondary market" (from third parties) violates Upper Deck's exclusive rights. Score Board counters that its contracts with Mickey Mantle and Joe Montana [3] permitted the sale of the memorabilia even after their contracts' expiration date. Score Board also maintains that it can lawfully purchase (and resell) indicia of Upper Deck athletes from third parties. The Court agrees with Score Board.

### A. The indicia of Mickey Mantle

#### 1. Sell-off rights the primary market

The issue over the indicia of Mickey Mantle is straightforward. Mantle signed a license agreement with Score Board on April 19, 1991, granting Score Board "the non-exclusive, non-assignable right" to sell items personally signed by Mantle for Score Board. (Score Board/Mantle Contract ¶ 2.) The contract, which was to expire on January 31, 1993, explicitly gave Score Board the right to sell any remaining merchandise after the expiration date:

11. *Sales after termination*

(a) Should this Agreement expire by its own terms, Licensee shall be permitted to sell its remaining inventory of Licensed Product following the termination date of this Agreement; provided, however, Licen-

---

**3.** The Court denies Score Board's request to consider the exclusivity motion as applicable to the indicia of Wayne Gretzky, Reggie Jackson, Ted Williams, and Michael Jordan, as the parties have not had the opportunity to address fully the relevant contracts of those athletes. The Court

will entertain future exclusivity motions as they relate to the remaining four athletes, assuming the Court's calendar permits those motions to be heard prior to trial. Of course, much of the legal analysis in this Order applies with equal force to the other athletes.

see shall have paid all royalty amounts due Licensor hereunder.

(Id.¶ 11(a).) The language here could not be clearer.

Mantle subsequently signed a licensing agreement with Upper Deck (UDC) for the period of February 1, 1993 through January 31, 1996, granting UDC

> exclusive worldwide rights to use and reuse ... Mantle's name (as well as any nicknames), image, likeness, artists' portrayal of image or likeness, visual representation, signature (or facsimile thereof), photograph, voice, biography, statistics and endorsements ("Publicity Rights") on and in connection with the advertisement, promotion, give-away, and/or sale of any sports or entertainment item, product, merchandise or goods (the "Products") or services or other activity (the "Services"), in any sales, promotional and/or marketing area related to the sports or entertainment industry.

(Upper Deck/Mantle Contract ¶ 1.1.) The Upper Deck/Mantle exclusivity clause provides:

> During the term of this Agreement, and any renewals thereafter, Mantle shall not render any services for or on behalf of, nor shall Mantle authorize his Publicity Rights to be used in or as part of, or in advertising, publicizing or promoting any item, product, merchandise, goods, service or activity, except as noted below in Section 1.2 C. and D.

(*Id.* ¶ 1.2.) As one of the exceptions mentioned above, the contract explicitly recognizes Mantle's agreement with Score Board and the fact that "sell off of remaining inventory after expiration [is] allowed." (*Id.* ¶ 1.2(C)(8).) The agreement contains thirteen additional exceptions to Upper Deck's "exclusive" rights. (*Id.* ¶ 1.2(C), (D).)

Upper Deck concedes (as it must) that, even after the Score Board/Mantle contract expired, Score Board was entitled to sell genuine Mantle product supplied by Mantle during the course of the Score Board/Mantle agreement. The only issue regarding the Mantle indicia is the legality of Score Board's sale of Mantle's products purchased on the secondary market.

### 2. The secondary market

██ Upper Deck argues that Score Board's participation in the "unsavory" secondary market violates the Lanham Act and California's antidilution statute. This secondary market activity, Upper Deck contends, causes consumer confusion by falsely representing that Score Board is affiliated with both the athletes and Upper Deck, "the sole sources of authorized memorabilia bearing the Athletes' Indicia." Plaintiff's claim Score Board's secondary market participation—in which Score Board allegedly does not follow Upper Deck's patented authentication procedures—has tarnished the marks, and injured the reputation of Upper Deck and the athletes.

Upper Deck ignores the long-standing "first sale" doctrine, which states that once a product enters the market, its trademark is not infringed by subsequent sales. See *Sebastian Int'l. Inc. v. Longs Drug Stores Corp.*, 53 F.3d 1073, 1074 (9th Cir.) ("Resale by the first purchaser of the original article under the producer's trademark is neither trademark infringement nor unfair competition."), *cert. denied,* —— U.S. ——, 116 S.Ct. 302, 133 L.Ed.2d 207 (1995); *Allison v. Vintage Sports Plaques,* 40 U.S.P.Q.2d 1465, 1468 (N.D.Ala.1996) (applying first sale doctrine to rights of publicity in context of sports trading cards).

The first sale doctrine applies even when there is a likelihood of consumer confusion. In *Sebastian,* for example, the plaintiff, a manufacturer of hair care products, sold its goods only to an organization of professional salons and distributors, all of whom agreed to resell the manufacturer's products only to other members of the organization. *Sebastian,* 53 F.3d at 1074. Sebastian sought to prevent Longs Drug Stores (not a member of the organization) from reselling Sebastian products that Longs had purchased from third-parties (presumably from members of the organization, in violation of their contracts with Sebastian). The Court rejected Sebastian's argument that since Long's resales had confused consumers "into believing [falsely] that there is some type of affiliation,

association, or approval between Longs and Sebastian," the first sale doctrine should not apply. *Id.* at 1075. The Ninth Circuit explained, "The 'first sale' rule is not rendered inapplicable merely because consumers erroneously believe the reseller is affiliated with or authorized by the producer." *Id.*

In *NEC Electronics v. CAL Circuit Abco,* 810 F.2d 1506 (9th Cir.), *cert. denied,* 484 U.S. 851, 108 S.Ct. 152, 98 L.Ed.2d 108 (1987), the Ninth Circuit applied the first sale doctrine to computer chips sales, despite the district court's finding "that some purchasers ... mistakenly thought their chips were protected by [the producer's] servicing and warranties." *Id.* at 1508. Like the plaintiff in NEC, Upper Deck claims that Score Board's sale of memorabilia purchased on the secondary market will confuse consumers into thinking that the items have met Upper Deck's heightened standards of authenticity. As the NEC Court explained, though, this alone is not enough to sustain a Lanham Act claim. *NEC,* 810 F.2d at 1510 (noting that if defendant actually misled the public about the availability of plaintiff's servicing and warranties, plaintiff "may be liable in contract or tort, but not in trademark").

In addition to the well-settled precedent, Upper Deck's position is foreclosed both by standard industry practice and by common sense. First, Upper Deck's president, Allen Thomas, has acknowledged that purchases on the secondary market for autographed sports memorabilia are common and expected. (Thomas Dep. at 143:9–145:17.) Second, Upper Deck's legal position simply does not make sense in the current market. Under its theory, anyone who owns an item signed by an Upper Deck athlete is prohibited from selling it. This is absurd, and would grant Upper Deck the contractual power to destroy the market value of all preexisting, lawfully obtained collectibles.

If Upper Deck has valid concerns about whether the items purchased by Score Board from third parties and later resold to the public are inauthentic, those claims are more properly raised in a false advertising or unfair competition action. See infra Parts III and IV. Upper Deck has no legal basis, however, for raising a general challenge to Score

Board's participation on the secondary market.

### B. The indicia of Joe Montana

#### 1. Sell-off rights: the primary market

■ The case of Joe Montana is less clear-cut, since the contract itself is silent as to sell-off rights. The Score Board/Montana agreement, signed on October 5, 1990, states:

> During the "Contract Period" of this Agreement, as hereinafter defined, Licensor agrees that it will make available to Company [Score Board] the services of Montana to place his personal autograph on various items of sports-related merchandise. Company hereby represents that it intends and desires to supply such merchandise to be autographed by Montana and that Company will thereafter distribute and sell such autographed merchandise to autograph collectors and others [sic] sports fans. Licensor agrees that Company shall have the right to advertise, distribute and sell such autographed merchandise, but Company shall not have the right to use the name, likeness, photograph or endorsement of Montana for advertising or promotion of any brand name or trademark appearing on any such merchandise. For example, Company shall have the right to advertise the sale of "Joe Montana autographed footballs" but shall not have the right to advertise or promote "Joe Montana Wilson footballs."

(Score Board/Montana Contract ¶ 1.) The "Contract Period" referenced above was not a fixed date, but rather was to terminate when total compensation paid reached a certain amount. (*Id.* ¶ 2.) While that contract was still in effect, Montana and Score Board executed a second agreement, similar to the first, providing for additional items to be autographed. Although there was once again no fixed term, the contract was set for a minimum of one year and a maximum of two years. The parties eventually set an exact termination date of June 30, 1993.

While the Score Board/Montana contract is silent as to sell-off rights, there are numerous compelling reasons supporting the conclusion that such rights were implicit in the

agreement. First, a logical reading of the contractual conditions supports this analysis. Since the initial agreement was to terminate only upon completion of a certain number of autographs, it strains credulity to think that Score Board would have no right to sell the items autographed on that final day.

Second, there is ample evidence that both parties contemplated unlimited post-contractual sell-off rights. Score Board's president, Kenneth Goldin, has testified that Score Board tries "at all costs to make sure no sell-off provisions [setting a period of time after the expiration of an agreement that the licensee has to dispose of inventory featuring the licensed products] are included in the contracts." (Goldin Dep. at 221:20-25.) Score Board avoids such provisions so it does not "have to dump a large quantity of product in the marketplace over a short period of time...." (*Id.* at 222:11-14.) Through his agents, International Management Group ("IMG"), Montana stated in a February 4, 1994 letter that "Score Board is permitted to sell off its existing inventory of products which had been autographed by Joe Montana during the term of the Contract...." (Prince Letter, Feb. 4,1994.) An internal memorandum written by Montana's agent confirms the parties' mutual understanding: "Joe signed two memorabilia contracts with Scoreboard, the last one which terminated on June 30, 1993, *they have an unlimited sell off period.*" (Lund Memo, June 3, 1994 (emphasis added)).

Third, there is substantial evidence—even from Upper Deck executives—that standard industry practice permits the post-contractual sale of autographed sports memorabilia. Stuart Ellis, a former president of UDA, testified that when contracts are silent as to sell-off rights, the licensee generally may sell its remaining inventory.[4] Similarly, Al Thomas, the UDA executive who negotiated the UDA/Montana contract with IMG, has stated that "it is customary in the memorabilia business for there to be a sell off of inventory after the expiration of an endorsement agreement." (Thomas Decl. ¶ 6.) Finally, Ken Goldin, president of Score Board has declared that, "[a]bsent such 'sell off' provisions, it is customary to sell inventory at any time." (Goldin Decl. ¶ 4.) Upper Deck offers no evidence that standard industry practice prohibits post-contractual sell-off.

Fourth, Score Board's position is not weakened by any relevant case law. California law appears to be silent on sell-off rights in the sports memorabilia industry, and decisions from this Circuit and from other jurisdictions reach contradictory conclusions depending on the industry involved. *Compare NEC Electronics v. CAL Circuit Abco,* 810 F.2d 1506, 1509 (9th Cir.) (holding, in case involving sales of computer chips, that "[o]nce a trademark owner sells his product, the buyer ordinarily may resell the product under the original mark without incurring any trademark law liability"), *cert. denied,* 484 U.S. 851, 108 S.Ct. 152, 98 L.Ed.2d 108 (1987) *and Advanced Sports Concepts, Inc. v. Baden Sports, Inc.,* 29 U.S.P.Q.2d 1227, 1229, 1993 WL 592529 (S.D.Ohio 1993) (noting that, where a contract for oversized basketballs is silent as to post-agreement sell-off rights, "trademark law generally does not reach the sale of genuine goods bearing a true mark even though such sale was without the owner's consent") (quoting *Weil Ceramics and Glass, Inc. v. Dash,* 878 F.2d 659, 671 (3d Cir.1989)) with *Bill Blass, Ltd. v. SAZ Corp.,* 751 F.2d 152, 154 (3d Cir.1984) (holding, in action concerning designer coats, that "[t]he sale of trademarked goods after termination of a license amounts to trademark infringement"). In light of the uncertainty and industry-specific nature of the case law, the

---

4. Ellis testified as follows:
 Q: In the customs and practices of your industry, are you telling me that you don't forfeit your inventory just because the athlete can no longer sign a new product for you?
 \* \* \* \* \* \*
 Q: Did you understand the question?
 A: Yes. And the practice of the industry, if it doesn't specifically state that you don't

 have the rights to sell it, then you still have the right to sell it. You paid the athlete to sign; you paid for the football.
 Now, I have a Joe Montana signed football. I didn't do that to decorate an office. I did that to resell that product for a profit.
 And to the extent it's not specifically stated in the agreement, then the company would still have the rights to sell that product off.
 (Ellis Dep. at 135:13-136:7.)

Court will rely on the other factors explored above to determine the nature of Score Board's sell-off rights under its agreement with Montana.

It is clear, therefore, that the Score Board/Montana agreement contemplated sell-off rights after the contractual period. The inquiry thus should end here. It is of no consequence for this case if, for some reason, Montana and IMG later convinced Upper Deck that Score Board had no sell-off rights. Such misrepresentations would speak to IMG's liability to Upper Deck (currently the subject of another action in this district), *not* to Score Board's liability. Nonetheless, it may be instructive to take a look at the Upper Deck/Montana agreements.

Upper Deck (as UDC) and Montana entered into a licensing agreement dated January 8, 1991. The agreement granted UDC the right to use Montana's name and likeness for the purpose of producing, promoting and advertising its products, as well as the right to have Montana make certain personal appearances and attend photography sessions. (UDC/Montana Contract ¶¶ 2.1, 2.2.)[5] The agreement seeks to give UDC exclusive rights with respect to trading cards only:

> During the term of this Agreement, Montana shall not render any Services for or on behalf of, nor shall Montana authorize his name, likeness, image, photograph, caricature, voice or biography to be used in or as part of, or in advertising, publicizing or promoting, any product of any other person, business or entity which product consists of Trading Cards or Holographic Products.

(*Id.* ¶ 2.3.)

In 1992, the shareholders of UDC joined with others to form UDA, which began negotiating another contract with Montana. The parties signed an agreement, effective October 1, 1992, which purported to give UDA the exclusive right to Montana's autograph. (UDC/Montana Contract, ¶ 2.2.)[6] In addition, the contract gave UDA the non-exclusive right to use Montana's name and likeness in connection with the production and sale of any of its products, even those that did not include Montana's original autograph. (*Id.* ¶ 2.1.)

Although Upper Deck now contends that this contract gave it the exclusive rights to sell any and all memorabilia signed by Montana, the evidence suggests otherwise. First, the UDA/Montana agreement includes an exception to its exclusivity provisions, which provides:

> Notwithstanding the foregoing to the contrary, UDA acknowledges that Montana has previously granted to Scoreboard, Inc. until June 30, 1993, the non-exclusive right to use the name, likeness, photograph and biographical information concerning Montana and services of Montana in the production of and distribution of items bearing the autograph of Montana and that such

---

**5.** The "Rights" covered under the agreement include:

*1.1.8.1.* The right to use the Endorsements for the purpose of (I) producing the Products, including the packaging thereof, and (ii) promoting and advertising the Products to the public in the Authorized Territory, through the use of television commercials on cable television only ... and radio commercials, and the use of photographs for point of sale and/or through print advertising materials, including without limitation, posters, programs, sales materials and advertisements in consumer and trade magazines and newspapers; and

*1.1.8.2.* The right to cause Montana to make Personal Appearances or participate in Photography Sessions, subject to the provisions of this Agreement.

Under the "Use of Rights" provision, the agreement states:

> Big Sky (Montana's company) hereby grants to Upper Deck the right and license, on the terms and conditions contained herein, to use and reuse the Rights in the advertisement, promotion and sale of the Products in all manner and media of communication, throughout the Authorized Territory....

**6.** That section reads:

> During the term of this Agreement, Montana shall not render any Services for or on behalf of, nor shall Montana authorize any of the Endorsements to be used in nor as part of, or in advertising, publicizing or promoting, any product of any other person, business or entity which product bears the authentic autograph of Montana.

(UDC/Montana Contract, § 2.2.)

arrangement shall not constitute a breach of the agreement.

(UDA/Montana Contract ¶ 2.2.1.) Although this paragraph does not specifically acknowledge Score Board's sell-off rights after June 30, 1993, it undoubtedly belies Upper Deck's overall claims of exclusivity. More importantly, representatives of both sides of the UDA/Montana agreement have stated that the contract was meant to give Upper Deck the exclusive right to *obtain* signed memorabilia during the contract period, not the exclusive right to sell previously autographed items. Al Thomas, the Upper Deck executive in charge of negotiating the UDA/Montana agreement, has declared:

> I understood and agreed on behalf of UDA that Montana could continue to perform under his agreement with Score Board until June 30, 1993, and that such performance would not constitute a violation of the UDA Agreement. For example, Montana could continue to autograph footballs for Score Board until June 30, 1993, but not thereafter. I recognized and understood that Score Board undoubtedly would have an inventory of products autographed by Montana prior to June 30, 1993, which would be sold off in the normal course of business after June 30, 1993.

(Thomas Decl. ¶ 6.) [7] Finally, Joe Montana himself has explained in a recent declaration:

> I did not give, and never intended to give, UDA the right to control, manage and direct the distribution of all sports memorabilia that I signed before I entered into a contract with UDA. Rather, by contract with UDA, I provided it with original auto-

graphs and agreed (with some exception) to refrain providing original autographs to other parties.

(Montana Decl. ¶ 5.) Thus, even if the exclusivity issue were not foreclosed by reference to the Score Board/Montana agreement, Upper Deck's position fails under the terms of its own contract with Montana.

In the end, common sense, the implications of the open-ended Score Board/Montana contract language, the intent of the parties, and standard industry practice all support Score Board's ability to sell its remaining validly obtained Montana items after its agreement expired.

### 2. The secondary market

For the reasons explained above in Part II.A.2, the first sale doctrine permits Score Board's sale of Montana memorabilia lawfully purchased on the secondary market.

Accordingly, the Court grants Score Board's motion for summary judgment on all causes of action based on Upper Deck's claimed rights of exclusivity to sell lawfully obtained, genuine autographed sports memorabilia signed by Mickey Mantle and Joe Montana.

### III. The authenticity motions

Upper Deck predicates its Seventh Claim for Relief for unfair business practices, Cal. Bus. & Prof.Code §§ 17200, *et seq.* (and the corresponding declaratory relief claim in Count VI), on, inter alia, California's Autograph Sports Memorabilia statute ("ASM" statue), Cal. Civil Code § 1739.7.[8] Score

---

**7.** Upper Deck claims that during the course of the negotiations over the UDA/Montana agreement, Peter Johnson, Montana's agent, represented to Upper Deck that although Montana had a prior commitment with Score Board, the agreement would expire on June 30, 1993, and Score Board would have no rights to sell its remaining inventory after that date. (McWilliam Dep. at 19:2–19.) Thomas's declaration indicates otherwise: "At no time did Peter Johnson, IMC [the parent company of IMG] or anyone else on behalf of Montana make any representation to me that Score Board would or could not sell off after June 30, 1993, products that had been autographed by Montana before June 30, 1993." (Thomas Decl. ¶ 6.)

**8.** Actions for unfair competition are necessarily premised on violations of other substantive laws. *See Farmers Ins. Exchange v. Superior Court,* 2 Cal.4th 377, 383, 6 Cal.Rptr.2d 487, 826 P.2d 730 (1992) ("[I]n essence, an action based on Business and Professions Code section 17200 to redress an unlawful business practice 'borrows' violations of other laws and treats these violations, when committed pursuant to business activity, as unlawful practices independently actionable under section 17200 et seq. and subject to the distinct remedies provided thereunder.").

Upper Deck has standing to bring an unfair business practices claim for violations of the ASM statute, since under Cal. Bus. & Prof.Code § 17204 an action may be brought by any "per-

Board, Shop at Home, CPG, and B & J have moved for summary judgment on the statutory compliance issue. Upper Deck opposes the authenticity motions on both Rule 56(c) and 56(f) grounds.

### A. Statutory compliance generally

Before reaching the merits of the motions, it is useful to set forth the appropriate legal standards for statutory compliance under Cal. Civil Code § 1739.7.

The ASM statute generally forbids dealers from representing an item "as a collectible if it was not autographed by the sports personality in his or her own hand." *Id.* § 1739.7(c). In addition, section 1739.7 requires dealers to provide prescribed certificates of authenticity with their signed collectibles. The statute states in relevant part:

(b) Whenever a dealer, in selling or offering to sell to a consumer a collectible in or from this state, provides a description of that collectible as being autographed, the dealer shall furnish a certificate of authenticity to the consumer at the time of sale. The certificate of authenticity shall be in writing and shall be signed by the dealer or his or her authorized agent. The certificate of authenticity shall be in at least 10-point boldface type and shall contain the dealer's true legal name and street address. Each certificate of authenticity shall do all of the following:

(1) Describe the collectible and specify the name of the sports personality who autographed it.

(2) Either specify the purchase price and date of sale or be accompanied by a separate invoice setting forth that information.

(3) Contain an express warranty, which shall be conclusively presumed to be

part of the bargain, of the authenticity of the collectible. This warranty shall not be negated or limited by reason of the lack of words such as "warrant" or "guarantee" or because the dealer does not have a specific intent or authorization to make the warranty or because any statement relevant to the collectible is or purports to be, or is capable of being, merely the dealer's opinion.

Cal. Civil Code § 1739.7(b). Amendments to the ASM statute, effective January 1, 1996, also require, among other things, that the certificate of authenticity: "(5) Indicate whether the item was autographed in the presence of the dealer," and "(8) Indicate whether the item was obtained or purchased from a third party. If so, indicate the name and address of this third party." *Id.*

The California legislature enacted § 1739.7 in response to growing concerns about fraud and forgery in the sports memorabilia business. *See. e.g.,* Scott Bowles, *Say It Ain't So! FBI Finds 70% of Sports Autographs Are Fake,* Wash. Post, Oct. 31, 1996, at A1 ("[A]ccording to the FBI, a stunning 70% of all autographed sports memorabilia are fraudulent."). The ASM statute buttresses the general express warranty provisions of Cal. Com.Code § 2313,[9] providing heightened protections to the autographed sports memorabilia consumer. Although Score Board suggests that mere compliance with the facial requirements of § 1739.7 (i.e., issuing the certificate of authenticity in ten-point boldface, including the dealers true legal name and street address, specifying the name of the sports personality who autographed it, describing the collectible, including an express warranty, etc.) satisfies a dealer's statutory obligations, such a rule would eviscerate the effectiveness of the statute.

---

son, corporation or association or by any person acting for the interests of itself, its members or the general public." Cal. Bus. & Prof.Code § 17204; *see also Saunders v. Superior Court,* 27 Cal.App.4th 832, 839, 33 Cal.Rptr.2d 438 ("A plaintiff suing under § 17200 does not have to prove he or she was directly harmed by the defendant's business practices.").

**9.** For the most part, the language defining "express warranty" in Cal. Civil Code § 1739.7(b)(3) tracks that of the UCC provision. However,

while the UCC section provides that "an affirmation merely of the value of the goods or *a statement purporting to be merely the seller's opinion* or commendation of the goods *does not create a warranty,*" Cal. Com.Code § 2313(2) (emphasis added), the AMS statute applies the express warranty provisions even when statements about the authenticity of a collectible "is or purports to be ... merely the dealer's opinion." Cal. Civil Code § 1739.7(b)(3) The AMS thus imposes stricter warranty requirements on autographed sports memorabilia.

The Court, therefore, reads into § 1739.7 a more substantive requirement. While California courts have yet to consider the AMS statute, federal courts in other jurisdictions have held that, under the express warranty provisions of the Uniform Commercial Code (UCC), sellers of unique collectibles must have a "reasonable basis in fact" for believing that the items sold are authentic. *See, e.g., Balog v. Center Art Gallery,* 745 F.Supp. 1556, 1566 (D.Haw.1990) (applying "reasonable basis in fact" standard to warranties of artwork authenticity); *Dawson v. G. Malina, Inc.,* 463 F.Supp. 461, 467 (S.D.N.Y.1978) (same). At a minimum, sports collectibles dealers in California—where the ASM statute supplements and builds on the UCC's protections—must be held to a similar standard.

Under § 1739.7, then, dealers must satisfy the facial requirements of the statute and have a reasonable basis in fact for believing that an item of autographed sports memorabilia is authentic. This does not mean, as Upper Deck has suggested, that a dealer must witness the signing herself.[10] Nor must dealers follow Upper Deck's patented method for ensuring the genuineness of its product; Upper Deck employs but one of a limitless array of acceptable authentication procedures.[11] But dealers cannot escape civil liability simply by affixing an express warranty to an autographed sports collectible. Thus, to give § 1739.7 some enforcement teeth, the warranty must have a substantive foundation.

### B. The authenticity motions

In light of the above standards, the Court finds that there are material disputes of facts as to Defendants' facial and substantive compliance with California's authenticity requirements. In addition, there are numerous discovery issues still outstanding which render summary judgment inappropriate under Fed.R.Civ.P. 56(f). Accordingly, Defendants' authenticity summary judgment motions are denied.

### IV. Upper Deck's remaining claims

All of Upper Deck's claims against Shop at Home, CPG, and B & J remain in the action, as do Upper Deck's claims against Score Board relating to the indicia of Ted Williams, Reggie Jackson, Michael Jordan, and Wayne Gretzky.

Because the Court grants Score Board's exclusivity motion on the indicia of Mickey Mantle and Joe Montana, Score Board is entitled to summary judgment on most of Upper Deck's claims regarding those two athletes. But since Score Board's authenticity motion is denied, Upper Deck can still assert some claims on the basis of Score Board's alleged sales of inauthentic Mantle and Montana merchandise. The effect of the Court's summary judgment rulings are discussed below.

### A. Lanham Act (Count I)

To have standing to bring an infringement claim under the Lanham Act, Upper Deck must be the "exclusive licensee" of the athletes' marks. *See Ultrapure Systems, Inc. v. Ham–Let Group,* 921 F.Supp. 659, 665 (N.D.Cal.1996).

10. The recent amendments to the ASM statute foreclose any argument that dealers must actually witness the signature. Those amendments specifically require certificates of authenticity to "[i]ndicate *whether* the item was autographed in the presence of the dealer." Cal. Civil Code § 1739.7(b)(7). Surely, this contemplates the legal sale of items signed outside a dealer's presence.

11. Upper Deck argues that, in order to provide a lawful warranty and certificate of authenticity, a dealer must either personally observe an athlete autograph a collectible or obtain an original certificate of authenticity from one who witnessed the signing.

While this method certainly helps ensure that an item is genuine, it will often be impractical, as there are many situations in which there will not be—and cannot or need not be—an original certificate of authenticity. Consider this example: fan X gets Derek Jeter (American League Rookie of the Year) to sign a New York Yankees' baseball cap at the ballpark. Section 1739.7 does not apply, since X is not a "dealer" under the statute. X then sells the hat to Y, a "dealer" of sports memorabilia. Under Upper Deck's theory, Y would not be able to sell the hat, since Y doesn't have the original certificate of authenticity. Similar problems would arise where a signed collectible is first obtained outside of California, in a state without a certificate law.

It is significant that the athletes themselves (or their legal representatives) have stated that Upper Deck is not their exclusive licensee,[12] since "the rights of the licensee are based upon the rights of the owner or licensor." *Id.* In addition, Upper Deck executives have acknowledged that the company's contracts with the athletes did not affect pre-existing rights of third parties (such as Score Board, the National Football League, etc. ) to sell the athletes' merchandise. Most importantly, the Upper Deck contracts contain numerous carve-outs and exceptions, indicating the non-exclusivity of Upper Deck's licenses. For these reasons, and in light of the above analysis permitting Score Board to sell the athletes' products during the course of Upper Deck's purportedly "exclusive" agreements, Upper Deck cannot bring an *infringement* claim under the Lanham Act.

■ However, Upper Deck also appears to assert a false advertising claim under the Lanham Act. (FAC ¶ 49.)[13] To have standing to maintain this cause of action, plaintiff need only "allege commercial injury based upon a misrepresentation about a product, and also that the injury was 'competitive,' i.e., harmful to the plaintiff's ability to compete with the defendant." *Barrus v. Sylvania,* 55 F.3d 468, 470 (9th Cir.1995); *see also*

*Waits v. Frito–Lay,* 978 F.2d 1093, 1109 (9th Cir.1992) ("We have recognized that simple claims of false representations in advertising are actionable under section 43(a) when brought by competitors of the wrongdoer, even though they do not involve misuse of a trademark."), *cert. denied,* 506 U.S. 1080, 113 S.Ct. 1047, 122 L.Ed.2d 355 (1993).

Regarding the indicia of Mantle and Montana, then, Score Board is granted summary judgment on all of Count I except Upper Deck's claims for false advertising under the Lanham Act.

### B. Misappropriation of the right of publicity (Count II)

■ In California, the elements of the common law right of publicity cause of action "may be pleaded by alleging (1) the defendant's use of the plaintiff's identity; (2) the appropriation of plaintiff's name or likeness to defendant's advantage, commercially or otherwise; (3) lack of consent; and (4) resulting injury." *White v. Samsung Electronics America, Inc.,* 971 F.2d 1395, 1397 (9th Cir.1992).

Although there is scant California case law on standing issues in this area, the right of publicity appears to attach only to actual

---

**12.** Montana's declaration is clear:

3. Although my contract with UDA is said to be "exclusive," it actually contains various "carve outs," under which I was permitted to continue to sign various items of sports memorabilia to third parties.

4. Prior to entering into a contract with either Score Board or UDA, I autographed thousands of items for various parties.

5. I did not give, and never intended to give, UDA the right to control, manage and direct the distribution of all sports memorabilia that I signed before I entered into a contract with UDA. Rather, by contract with UDA, I provided it with original autographs and agree (with some exception) to refrain from providing original autographs to other parties.

(Montana Decl. ¶¶ 3–5.)

Similarly, Roy J. True, attorney and executor of Mantle's estate, has stated:

6. .... I negotiated the Mantle–Upper Deck contract. While Upper Deck called the Mantle–Upper Deck contract "exclusive," it was not an exclusive contract. In fact, the Mantle–Upper Deck contract contained at least fourteen separate exceptions to the

claimed "exclusive" rights secured by UDC.

7. One of the stated exceptions that the Mantle–Upper Deck contract recognized was Mr. Mantle's prior contractual relationship with Score Board and Score Board's right under that prior contract to continue to sell inventory past January 31, 1993.

8. Mr. Mantle never gave UDC the right to control, manage and direct the distribution of all sports memorabilia bearing his original autograph. Rather, by contract with UDC, Mr. Mantle merely provided UDC with original autographs and agreed (with many exceptions) to refrain from providing original autographs to other parties during the time period of the contract.

(True Decl. 6–8.)

**13.** The FAC alleges that the defendants violated § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), by "causing sports collectibles and memorabilia featuring and/or relating to the Athletes to be used in commerce in connection with a false or misleading designation of origin and/or representation of fact which is likely to cause confusion or to cause mistake or to deceive the public ..." (FAC ¶ 49.)

persons. *See National Football League v. Alley, Inc.,* 624 F.Supp. 6, 10 (S.D.Fla.1983) ("Assuming, without holding, that Florida's common law recognizes a right of publicity, the right is a personal one and may not be assigned to another entity."). Even if the right to publicity could be assigned under California law, it is unlikely that a non-exclusive licensee could assert it. *See Bi–Rite Enterprises, Inc. v. Button Master,* 555 F.Supp. 1188, 1200 (S.D.N.Y.1983) ("A nonexclusive licensee acquires no proprietary interest in the publicity rights of the licensor and accordingly has no standing to sue for violation of those rights." (citing 3 M. Nimmer, *Nimmer on Copyright* ¶¶ 10.02, 12.02 (1982))). This is especially true where, as here, the person on whose behalf the misappropriation claim is brought objects to the suit. Accordingly, the Court finds that Upper Deck lacks standing to assert a claim for misappropriation of the rights of publicity of Mickey Mantle and Joe Montana, and Score Board is granted summary judgment on those claims in Count II.

### C. Interference with contractual relations (Count III)

In light of the discussion in Part II concerning Score Board's sell-off and secondary market rights, Score Board is granted summary judgment on all of Count III relating to Upper Deck's claimed exclusive rights to sell the indicia of Mickey Mantle and Joe Montana.

### D. Dilution, Cal. Bus. & Prof.Code § 14330 (Count IV)

■■■■ The state law antidilution claim, Cal. Bus. & Prof.Code § 14330,[14] bears many similarities to the federal Lanham Act infringement action, and is meant to prevent "the whittling away" of one's trademark by the unauthorized use by another. *Saks & Co. v. Hill,* 843 F.Supp. 620, 624 (S.D.Cal. 1993), *appeal dismissed,* 65 F.3d 175 (9th Cir.1995). Upper Deck alleges that "Defendants' use ... of the Athletes' Indicia is

likely to injure Plaintiff and the Athletes business reputation and goodwill, whittle away the distinctiveness of Plaintiff and the Athletes' rights, and dilute the distinctive value of Memorabilia bearing the Athletes' Indicia marketed and sold by Plaintiff. ..." (FAC, ¶ 59.)

■■■■ To make out a dilution claim, a plaintiff must show: "(1) that his trademark is strong, and (2) that it has been associated with something unsavory." *American Economy Ins. Co. v. Reboans, Inc.,* 852 F.Supp. 875, 880 (N.D.Cal.1994) (citations omitted); *see also Accuride Int'l. Inc. v. Accuride Corp.,* 871 F.2d 1531, 1538 (9th Cir.1989). As the Ninth Circuit has explained, the antidilution statute is "designed to protect only strong, well-recognized marks." *Accuride,* 871 F.2d at 1539.

In defending its dilution claim, Upper Deck focuses on the strength of the athletes' marks. (Pla. Suppl. Opp'n at 19) Yet, as described above, Upper Deck cannot claim ownership in (or pursue a claim to defend) trademarks of which it is merely the non-exclusive licensee. Even assuming, *arguendo,* that Defendants' sale of forged memorabilia injures the *athletes'* marks, Upper Deck cannot raise a dilution claim to protect the "Upper Deck" mark unless that mark is sufficiently distinct and somehow associated with the forgeries, i.e., unless Defendants sold fake collectibles with the "Upper Deck" mark.

Accordingly, Score Board is granted summary judgment on Count IV with respect to the indicia of Mickey Mantle and Joe Montana.

### E. Unjust enrichment. constructive trust. accounting (Count V)

Since this cause of action is based entirely on Upper Deck's "exclusivity" theory, the Court grants Score Board's summary judgment motion on Count V regarding the indicia of Mickey Mantle and Joe Montana.

---

14. The statue provides:

Likelihood of injury to business reputation or of dilution of the distinctive quality of a mark registered under this chapter, or a mark valid at common law, or a trade name valid at common law, shall be a ground for injunctive relief notwithstanding the absence of competition between the parties or the absence of confusion as to the source of goods or services. Cal. Bus. & Prof.Code § 14330.

### F. Declaratory relief (Count VI)

Score Board is granted summary judgment on any part of Upper Deck's declaratory relief claim based on its claimed exclusive rights to sell the indicia of Mickey Mantle and Joe Montana. Summary judgment is denied as to the balance of Count VI.

### G. Unfair competition (Count VII)

Score Board is granted summary judgment on all aspects of Upper Deck's unfair competition claim that are or may be grounded in allegations of trademark infringement under the Lanham Act, misappropriation of the right of publicity, interference with contractual relations, violations of the California dilution statute, unjust enrichment, constructive trust, and accounting, as these claims related to the indicia of Mickey Mantle and Joe Montana. Summary judgment is denied on Count VII with respect to Upper Deck's false advertising claims under the Lanham Act and alleged violations of Cal. Civil Code § 1739.7.

### CONCLUSION

For the reasons stated above, IT IS HEREBY ORDERED that:

1. The summary judgment motions of Score Board, Shop at Home, CPG, and B & J relating to Upper Deck's claims of alleged violations of Cal. Civil Code § 1739.7 are DENIED;

2. Score Board's summary judgment motion relating to Upper Deck's claimed rights of exclusivity in the indicia of Mickey Mantle and Joe Montana is GRANTED. Score Board is GRANTED summary judgment on the following claims in Upper Deck's First Amended Complaint, as they relate to sales of the indicia of Mickey Mantle and Joe Montana: Count I (for trademark infringement, but not for false advertising), Count II, Count III, Count IV, Count V, Count VI (for claims based on Upper Deck's exclusivity theory only), and Count VII (for claims based on Upper Deck's exclusivity theory only).

IT IS SO ORDERED.