**BLISS CLEARING NIAGARA, INC., Plaintiff,**

v.

**MIDWEST BRAKE BOND CO, Defendant.**

No. 5:02–CV–67.

United States District Court, W.D. Michigan, Southern Division.

Aug. 30, 2004.

John M. Brown, Bruce G. Davis, Dykema, Gossett PLLC, Lansing, MI, and Douglas A. Dozeman, Warner, Norcross & Judd, LLP, Grand Rapids, MI, for Plaintiff.

Dean W. Amburn, Robert J. Lenihan, II, Harness, Dickey & Pierce, P.L.C., Troy, MI, and Richard A. Gaffin, Miller, Canfield, Paddock & Stone, PLC, Grand Rapids, MI, for Defendant.

## *OPINION*

QUIST, District Judge.

### TABLE OF CONTENTS

I. *Facts and Procedural History* .........................................953
 A. BCN/Clearing and its Predecessors ...............................953
 B. Midwest........................................................954
 C. Business Transactions and Negotiations Between the Parties................954
 D. Midwest's Use of the Torc–Pac Mark...............................955
 E. The Litigation..................................................956

II. *Summary Judgment Standard* ....................................957

III. *Discussion* ....................................................957
 A. Trademark Issues .............................................958
 1. Standing..................................................958
 2. Limitations, Laches, and Acquiescence...............................961
 3. Fair Use Defense ..........................................962
 4. Likelihood of Confusion ......................................963
 a. *Strength of the Plaintiff's Mark*................................964
 b. *Relatedness of the Goods*....................................965
 c. *Similarity of the Marks* .....................................965
 d. *Evidence of Actual Confusion* .................................966
 e. *Marketing Channels Used* ....................................966
 f. *Likely Degree of Purchaser Care*................................967
 g. *Intent of Defendant* ........................................967
 h. *Expansion of Product Line* ...................................967
 i. *Conclusion Regarding Likelihood of Confusion* ...................968
 5. Actual Confusion—Dilution Claim .................................968
 B. MUTSA Claim ...............................................969
 C. Breach of Contract (Count V) ...................................969
 D. Counts VI, VII, IX, and X .....................................971
 1. Tortious Interference..........................................971
 2. Unfair Competition...........................................973
 3. Fraud ....................................................973
 4. Accounting .................................................974
 E. Determination of Trade Secret ...................................974

IV. *Conclusion* ....................................................974

Plaintiff, Bliss Clearing Niagara, Inc. ("BCN/Clearing"), has sued Defendant, Midwest Brake Bond Co. ("Midwest"), alleging claims for trademark infringement, unfair competition, and dilution under the Lanham Act, 15 U.S.C. §§ 1114, 1125(a) and (c), a claim for misappropriation under the Michigan Uniform Trade Secrets Act ("MUTSA"), M.C.L. § 445.1901–.1910, and various tort claims. BCN/Clearing alleges that, among other things, Midwest obtained and used BCN/Clearing's trade secrets and confidential and proprietary in-formation to manufacture, distribute, and sell a machine and parts identical to BCN/Clearing's "Torc–Pac 40" clutch and parts. Now before the Court are the following motions filed by Midwest: (1) motion for summary judgment on Counts I, II, and III of BCN/Clearing's complaint (the Lanham Act claims) ("First Motion"); (2) motion for summary judgment on Count IV of BCN/Clearing's complaint on the basis that the Michigan Uniform Trade Secret Act mandates dismissal of

BCN/Clearing's claim for trade secret misappropriation ("Second Motion"); (3) motion for summary judgment on Count V and the remaining portions of Counts IV, VI, and VII (statutory misappropriation of trade secrets; breach of contract; tortious interference with contractual relations and advantageous business opportunity; and unfair competition) on the basis that BCN/Clearing's purported trade secrets are not secret ("Third Motion"); (4) motion for summary judgment on Count V of BCN/Clearing's complaint (breach of contract) ("Fourth Motion"); and (5) motion for summary judgment on Counts VI, VII, IX, and X of BCN/Clearing's complaint (tortious interference with contractual relations and advantageous business opportunity; unfair competition in violation of the common law; fraud; and accounting) ("Fifth Motion").

## I. *Facts and Procedural History*

### A. BCN/Clearing and its Predecessors

BCN/Clearing is engaged in the business of developing, manufacturing, marketing, servicing, selling, and rebuilding industrial presses and components such as clutches and brakes and other machines under the trade names of Bliss, Clearing, Torc–Pac, and Niagara. One of BCN/Clearing's products is the well-known "Torc–Pac 40" wet-type clutch.[1] The Torc–Pac was developed in approximately 1958 by the Clearing Division of U.S. Industries, Inc. to work with a press it manufactured for various industrial applications. Over the past 40 or so years, the press has become well known in the manufacturing industry as the "Clearing" press.

Gordon Sommer was the Director of Research for the Clearing division when the Torc–Pac 40 was developed, and in 1956 he became the Vice President—Engineering of Clearing–Chicago. Mr. Sommer spearheaded the initiative to develop a wet clutch, and in that effort he hired John Liu, an engineer, to design a wet clutch for Clearing presses.[2] On February 13, 1962, the United States Patent office issued patent number 3,020,990 (the "'990 patent") for the Torc–Pac 40 in the name of John Liu. Liu subsequently assigned the '990 patent to Clearing.

In 1984, Clearing, Inc. acquired some or all of the assets of U.S. Industries, Inc. Clearing, Inc. subsequently changed its name to U.S.I. Press Company. In November 1986, U.S.I. Press Company transferred certain assets to Hitachi Zosen Clearing, Inc. (then known as HZ America Corp.), including those used in the manufacture of the Clearing press. In September 1992, Verson International Group and its subsidiary purchased the business and certain assets of Hitachi Zosen Clearing, Inc. Subsequent to that sale, Hitachi Zosen Clearing, Inc. changed its name to Chicago Service, Inc., and Verson International Group, through related transactions, assigned all of its rights, benefits, and liabilities acquired in the 1992 transaction, including the assets used in the Clearing press business, to a related entity, Clearing International, Inc. In approximately 1994, Clearing International, Inc. transferred its assets and liabilities to Niagara Machine & Tool Works, and Niagara Machine & Tool Works was renamed Clearing–Niagara, Inc. In March 1996, CNB International, Inc. ("CNB") acquired the assets of Clearing–Niagara, Inc. and E.W.

---

**1.** "Torc–Pac" refers generally to the wet-type clutch that BCN/Clearing's predecessors developed, while "Torc–Pac 40" refers to the specific Torc–Pac model.

**2.** Sommer later worked for Midwest either as a full-time employee or as a consultant until 1997.

Bliss, Inc. In March 1999, CNB filed a Chapter 11 bankruptcy petition. BCN/Clearing was formed in connection with CNB's bankruptcy and acquired certain of CNB's assets pursuant to the Fifth Amended Plan of Reorganization. When used in this Opinion, "Clearing" refers to all of BCN/Clearing's predecessors that manufactured the Clearing press and Torc–Pac 40 clutch.

U.S. Industries, Inc. registered the Torc–Pac trademark on April 18, 1967. U.S. Industries, Inc. assigned the Torc–Pac mark and registration to U.S. Press, Inc. (Clearing, Inc.), and U.S. Press, Inc. subsequently assigned the Torc–Pac mark and registration to Chicago Service, Inc. (Hitachi Zosen Clearing, Inc.) Chicago Service, Inc. ("CSI") is currently the record owner of the Torc–Pac mark and registration. In connection with the 1992 asset sale, CSI licensed its trademark and proprietary rights, including the Torc–Pac trademark, to Clearing International, Inc. Pursuant to a Settlement Agreement (the "Settlement Agreement") dated January 27, 1995, CSI and Clearing International, Inc. agreed to resolve certain disagreements that had arisen following the 1992 asset sale. BCN/Clearing succeeded to the rights granted to Clearing International, Inc. pursuant to the Settlement Agreement as a result of the intervening transactions involving Clearing International, Inc., Clearing–Niagara, and CNB and the CNB bankruptcy.

## B. Midwest

Midwest was established in 1950 to provide friction products such as clutches, brakes, drives, and friction material to the automotive industry and other segments of the manufacturing industry. In addition to other products, Midwest has developed its own wet clutch/brake design. Midwest also makes replacement parts for other wet clutch manufacturers. Midwest began repairing Torc–Pac 40 wet clutches in approximately 1985 or 1986. Midwest has since competed with Clearing and other companies to service, repair, and provide replacement parts for Torc–Pac 40 wet clutches.[3]

## C. Business Transactions and Negotiations Between the Parties

Prior to 1993, Clearing had an established buyer/supplier relationship with Midwest. Clearing was aware that Midwest had manufactured a line of clutch and brake products and materials, and Clearing had purchased such materials from Midwest. In approximately 1993, Clearing and Midwest discussed the possibility of a joint venture aimed at capturing a greater share of the after-market for Torc–Pac 40s as well as for clutch and brake components for competitors' presses. Although the venture never materialized, Clearing and Midwest continued their preexisting business relationship.

Clearing and Midwest renewed their discussions regarding a joint venture in late 1995 and early 1996. Clearing sought to reduce its costs by having Midwest produce Torc–Pac 40 parts and/or perform Clearing's Torc–Pac 40 repair work. In connection with these discussions, Clearing, on or about January 23, 1996, delivered a complete set of Torc–Pac 40 drawings to Midwest to enable Midwest to quote its costs to produce certain Torc–Pac 40 parts. Clearing and Midwest signed a Confidentiality Agreement, which provided:

> The clutch and brake drawing sets for the Torc–Pac 40, D22–D22 and D28–D28

---

3. With regard to replacement parts, the Court notes that there is no evidence that any company other than Clearing and Midwest has provided Torc–Pac replacement parts made to OEM specifications.

are being furnished to you for quotation purposes only. It may not be duplicated or distributed in any manor [sic] whatsoever without written authorization from Clearing–Niagara.

Each print is the property of Clearing–Niagara, Inc., and contains confidential information. It is being issued to you in confidence on the condition that it is to be returned on request and that it is not to be copied or reproduced in any way or used to furnish information to others, or used in the manufacture of the subject matter thereof, without the written consent of Clearing–Niagara, Inc.

(Confidentiality Agreement, Def.'s Br. Supp. Fourth Mot. Ex. 14.) The parties were not able to agree upon satisfactory terms for a joint venture. On or about February 23, 1996, Midwest delivered the Torc–Pac 40 drawings covered by the Confidentiality Agreement to its business attorneys at the law firm of Marco, Watkins and Owsiany LLP ("MWO"). (Watkins Aff. ¶¶ 4, 5, Def.'s Br. Supp. Fourth Mot. Ex. 12.) The drawings remained at MWO's offices until November 13 or 14, 1996, when MWO returned them to John G. Comley at Clearing. (*Id.* ¶¶ 7, 8.)

Following the 1996 discussions, Midwest manufactured Torc–Pac 40 replacement parts and by March of 1999 was manufacturing and selling complete new and refurbished Torc–Pac 40–type clutches. Clearing purchased Torc–Pac 40 parts from Midwest on several occasions from 1998 to 2000. On or about February 9, 2000, Clearing purchased an entire Torc–Pac unit from Midwest because Clearing was unable to meet its customer's demand for a Torc–Pac 40 unit that same day.

## D. Midwest's Use of the Torc–Pac Mark

Midwest began to use the Torc–Pac mark in its advertising materials in 1999. Midwest first used the mark on its website in February 1999, stating that Midwest had "[a] first class Torc–Pac program, including new units, exchange units, parts and services." (Johnston Aff., Def.'s Br. Supp. First Mot. Ex. X.) Midwest also used the Torc–Pac mark in a marketing document prepared and/or distributed in 2000. That document showed a picture of a Midwest replica Torc–Pac 40 and stated, "Torc–Pac 40 Ready For Immediate Delivery." (Pl.'s Br. Opp'n Def.'s First Mot. Ex. 12.) The document also repeated the statement from Midwest's website that Midwest had "[a] first class Torc–Pac program, including new units, exchange units, parts and services." (*Id.*)

In the fall of 2000, Clearing learned that Midwest was using the Torc–Pac mark in its marketing literature without attributing ownership of the mark to Clearing. (Laski Aff. ¶¶ 27–29, Pl.'s Br. Opp'n Def.'s First Mot. Ex. 12.) On October 5, 2000, Clearing's counsel notified Midwest by letter of Clearing's concerns that Midwest was misusing the Torc–Pac 40 drawings covered by the 1996 Confidentiality Agreement and that Midwest was infringing Clearing's trademark rights. (Letter from Semmelhack to Taylor of 10/5/00, Pl.'s Br. Opp'n Def.'s First Mot. Ex. 13.) By letter dated October 24, 2000, Midwest's counsel informed Clearing's counsel that his investigation showed that: (1) Midwest had never used Clearing's drawings covered by the Confidentiality Agreement to produce its products; and (2) while Midwest had used the Torc–Pac mark in its trade literature, his understanding was that such use had been accompanied by a reference to Clearing as the owner of the mark. (Letter from Miller to Semmelhack of 10/24/00, Pl.'s Br. Opp'n Def.'s First Mot. Ex. 15.) Midwest's counsel also stated that in the future, Midwest would refrain from using

the Torc–Pac mark without referring to Clearing as the owner of the mark; that Midwest would return to Clearing, to the extent not previously done, all of the drawings and other materials furnished under the 1996 Confidentiality Agreement; and that in the future Midwest would produce Torc–Pac 40 replacement parts from its own drawings which existed prior to the 1996 Confidentiality Agreement. (*Id.*)

In the Summer of 2001 during a meeting with Midwest, BCN/Clearing discovered that Midwest was using a marketing document that misidentified a Midwest Torc–Pac 40 replica as a Torc–Pac 40 unit. (Stowell Aff. ¶¶ 2, 4, Pl.'s Br. Opp'n Def.'s First Mot. Ex. 16.) BCN/Clearing also discovered that Midwest was manufacturing a replica of the entire Torc–Pac 40 unit and was affixing a "Midwest Brake" nameplate to the unit. (*Id.* ¶ 6.) Finally, BCN/Clearing learned that Midwest was providing a manual to its customers for Midwest's Torc–Pac 40 replica that was virtually identical to the manual developed by BCN/Clearing's predecessors. (Stroner Aff. ¶¶ 14–17, Pl.'s Br. Opp'n Def.'s First Mot. Ex. 17.) The manual did not identify BCN/Clearing or its predecessors as the manufacturer of the Torc–Pac 40 or as the holder of the license to the Torc–Pac mark.

## E. The Litigation

BCN/Clearing filed suit against Midwest on April 25, 2002. In its ten-count complaint, BCN/Clearing alleged claims for trademark infringement, statutory unfair competition, and dilution under the Lanham Act; misappropriation of trade secrets in violation of the common law and the Michigan Uniform Trade Secrets Act; breach of contract; tortious interference with contractual relations and advantageous business opportunity; unfair competition in violation of the common law; conversion; fraud; and accounting.

During discovery, Midwest sought to determine in an interrogatory to BCN/Clearing the trade secrets BCN/Clearing contends were misappropriated by Midwest. BCN/Clearing initially responded that the trade secrets included all of the information in the drawings that Clearing supplied to Midwest in January 1996. In response to a motion to compel by Midwest, BCN/Clearing stated in a supplemental answer that the trade secrets included all of the revisions Midwest made to its drawings after January 23, 1996, that incorporated proprietary information from Clearing's drawings. After Midwest filed another motion to compel, BCN/Clearing provided another answer in which it stated that the misappropriated information is found in the revision table included in Midwest's drawings. This time, BCN/Clearing provided a copy of Midwest's drawings on which it highlighted each post-January 1996 revision as reflecting the trade secrets allegedly misappropriated by Midwest. Following the deposition of Phillip Schlachter, BCN/Clearing's Rule 30(b)(6) witness on the issue of trade secrets, BCN/Clearing provided to Midwest a second set of highlighted Midwest drawings deleting some of the previously-highlighted changes as trade secrets BCN/Clearing alleges were misappropriated by Midwest.

Also during discovery, it came to light that Midwest possessed at least three sets of Torc–Pac 40 engineering drawings of the type that BCN/Clearing alleges to be trade secrets. Two sets of the drawings have the date December 20, 1990, stamped on them and contain the serial number "85–1311." The third set of drawings apparently came from a former Clearing employee who left employment with that company to work for Midwest in approximately 2000.

The Court has issued one previous decision on the merits in this case. On May 14, 2003, the Court issued an Opinion and Order regarding Midwest's Rule 12(c) motion for judgment on the tortious interference, unfair competition, conversion, and common law misappropriation claims. *See Bliss Clearing Niagara, Inc. v. Midwest Brake Bond Co.*, 270 F.Supp.2d 943 (W.D.Mich.2003). Midwest argued that it was entitled to judgment on these claims because they were displaced by MUTSA. Midwest also argued that BCN/Clearing's claims occurring before the enactment of MUTSA, and thus not affected by MUTSA's displacement provision, were untimely. The Court denied the motion based upon displacement with regard to the tortious interference and unfair competition claims and granted it with respect to the conversion claim. *Id.* at 950–51. The Court also held that the common law misappropriation claim is displaced by MUTSA to the extent that it relies upon allegations of misappropriation occurring after the effective date of MUTSA. *Id.* at 951. The Court also held that the conversion claim was barred by the statute of limitations and that the common law misappropriation, unfair competition, and tortious interference claims were similarly barred to the extent that they relied upon acts occurring more than three years prior to the date BCN/Clearing filed its complaint. *Id.* at 953–54. Finally, the Court held that the discovery rule does not apply to misappropriation of trade secret, unfair competition, and tortious interference claims. *Id.*

## II. *Summary Judgment Standard*

Summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. Fed. R.Civ.P. 56. Material facts are facts which are defined by substantive law and are necessary to apply the law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A dispute is genuine if a reasonable jury could return judgment for the non-moving party. *Id.*

The court must draw all inferences in a light most favorable to the non-moving party, but may grant summary judgment when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Agristor Financial Corp. v. Van Sickle*, 967 F.2d 233, 236 (6th Cir.1992) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986)).

## III. *Discussion*

As noted above, Midwest has filed five separate motions for summary judgment pertaining to different aspects of BCN/Clearing's claims. In its First Motion, Midwest argues that it is entitled to summary judgment on the trademark infringement, statutory unfair competition, and dilution claims because: (1) BCN/Clearing is not the owner of the mark and lacks standing to assert the infringement and dilution claims; (2) the claims are barred by the statute of limitations, laches, and acquiescence; (3) Midwest's use of the Torc–Pac mark constituted fair use; (4) there is no likelihood of confusion; and (5) BCN/Clearing has failed to support its dilution claim with evidence of actual confusion. In the Second Motion, Midwest argues that it is entitled to summary judgment on BCN/Clearing's misappropriation claim because the claim accrued before the effective date of MUTSA. Midwest's Third Motion asserts that summary judgment is proper on the misappropriation, breach of contract tortious interference, and unfair competition claims because the information in BCN/Clearing's Torc–Pac 40 drawings does not qualify as a trade secret. In its

Fourth Motion Midwest asserts that BCN/Clearing's breach of contract claim is barred by the six-year statute of limitations. Finally, the Fifth Motion seeks summary judgment on several of the state law claims upon various grounds.

## A. Trademark Issues

### 1. Standing

Midwest contends that BCN/Clearing lacks standing to assert claims for trademark infringement under 15 U.S.C. § 1114(1)(a) and dilution under 15 U.S.C. § 1125(c) because such actions may be brought only by the registrant and owner of the mark. Midwest argues that as a licensee of the Torc–Pac mark, BCN/Clearing is not a proper party to assert those claims. Midwest apparently concedes that BCN/Clearing has standing as a licensee to assert a claim for unfair competition in violation of 15 U.S.C. § 1125(a)(1). *See Frisch's Rests., Inc. v. Elby's Big Boy of Steubenville, Inc.,* 670 F.2d 642, 649 (6th Cir.1982) (holding that the plaintiff, an exclusive licensee of the mark, had standing to bring a claim under § 43(a)).

Section 32 of the Lanham Act, which governs actions for trademark infringement, limits the plaintiff in such actions to the "registrant" of the mark. *See* 15 U.S.C. § 1114(1) ("Any person who shall, without the consent of the registrant [infringe the registrant's mark] ... shall be liable in a civil action by the registrant for the remedies hereinafter provided.") A "registrant" also includes the registrant's "legal representatives, predecessors, successors and assigns." 15 U.S.C. § 1127. Section 43(c) of the Lanham Act provides that the "owner" of the mark may assert a claim against a person who causes dilution to the distinctive quality of the mark. 15 U.S.C. § 1125(c)(1). Nothing in the Lanham Act suggests that any person other than the registrant, in the case of a trademark infringement claim, or the owner, in the case of a dilution claim, has standing to seek relief for either violation. In this case, it is undisputed that BCN/Clearing is neither the registrant nor the owner of the Torc–Pac mark. Instead, BCN/Clearing is an exclusive licensee of the mark under the 1995 Settlement Agreement with CSI. The question, then, is whether BCN/Clearing's status as a licensee under the 1995 Settlement Agreement is sufficient to confer standing on BCN/Clearing.

The only Sixth Circuit authority on the issue of licensee standing in a trademark infringement case is *Wynn Oil Co. v. Thomas,* 839 F.2d 1183 (6th Cir.1988). The parties dispute the significance of the court's statements in that case. Midwest contends that the statements in that case regarding licensee standing are dicta because the court was not addressing the issue presented here, while BCN/Clearing contends that *Wynn Oil* establishes the rule in the Sixth Circuit that an exclusive licensee has standing to prosecute a trademark infringement action. Wynn Oil Co. was the owner and registrant of the service mark at issue and CCWI was the exclusive licensee of the mark. Wynn Oil and CCWI sued the defendant claiming infringement. The defendant argued that CCWI did not have standing to sue for infringement because CCWI had not proven any interest in the mark. In particular, the defendant argued that while CCWI claimed to have an exclusive license to use the mark, CCWI had failed to produce the license agreement establishing its interest. In spite of that failure, the court held that undisputed testimony from the plaintiffs' representatives regarding the existence of an exclusive license was sufficient to establish CCWI's interest. The court observed, "[t]his evidence establishes CCWI's standing to protect its rights in the service

mark." *Id.* at 1190. The Court does not find this brief statement in *Wynn Oil* helpful or instructive on the issue presented here. The issue in *Wynn Oil* was whether CCWI had presented sufficient evidence to establish an exclusive license. The court apparently was not asked to consider standing in light of the reference in Section 32 to the "registrant," nor was the court asked to determine whether CCWI had sufficient rights under the exclusive license agreement to constitute something akin to an ownership interest. While Midwest correctly notes that the registrant and owner, Wynn Oil, was also a plaintiff in that case, the Court is not convinced that the addition of the owner as a plaintiff constitutes a material distinction for purposes of the issue before the Court.

In spite of the statutory language limiting the proper plaintiff in a trademark infringement case to the registrant or its assignee, several courts have recognized that in some instances an exclusive licensee's interest in the mark may be sufficient to confer standing.[4] *See Quabaug Rubber Co. v. Fabiano Shoe Co.,* 567 F.2d 154, 159 (1st Cir.1977) (stating that some "courts have followed the approach used in patent infringement cases and permitted trademark infringement suits to be maintained by exclusive distributors and sellers of trademarked goods, i.e., 'exclusive licensees' who had a right by agreement with the owner of the trademark to exclude even him from selling in their territory"). The rule is that a licensee will have standing only where the licensing agreement grants the licensee either a property interest in the trademark or rights tantamount

to an assignment. *Calvin Klein Jeanswear Co. v. Tunnel Trading,* No. 98 Civ. 5408(THK), 2001 WL 1456577, at *4 (S.D.N.Y. Nov. 16, 2001). The Seventh Circuit has observed that " 'a truly exclusive licensee, one who has the right even to exclude his licensor from using the mark . . . is equated with an assign[ee] since no right to use [the mark] is reserved to the licensor, and the licensee's standing derives from his presumed status as an assignee.' " *Fin. Inv. Co. (Bermuda) Ltd. v. Geberit AG,* 165 F.3d 526, 531–32 (7th Cir.1998) (quoting 3 Jerome Gilson, Trademark Protection & Practice § 8.16(1)(b) (1997)). Thus, a licensee has no standing where the license is non-exclusive or the license does not equate to an assignment. *Quabaug Rubber Co.,* 567 F.2d at 159; *ICEE Distribs., Inc. v. J&J Snack Foods Corp.,* 325 F.3d 586, 598–99 (5th Cir.2003).

■ Although there is no precise rule for determining when a licensee's rights are sufficient to confer standing, the cases establish several useful principles. The following considerations, although not exhaustive, tend to weigh against standing: (1) the licensee lacks the power to exclude the licensor from using the mark in the licensee's territory, *see Quabaug Rubber Co.,* 567 F.2d at 159; *ICEE Distribs., Inc.,* 325 F.3d at 598–99; (2) the license provides that the licensor retains exclusive ownership of the mark, *see Ultrapure Sys., Inc. v. Ham–Let Group,* 921 F.Supp. 659, 665 (N.D.Cal.1996) (citing *DEP Corp. v. Interstate Cigar Co.,* 622 F.2d 621, 623 (2d Cir.1980)); (3) the license imposes geographical restrictions on the licensee's use of the mark, *see Calvin Klein Jeanswear*

---

**4.** The few courts that have considered the issue have indicated that the same rule applies to dilution claims under § 1125(c). *See ICEE Distribs., Inc. v. J & J Snack Foods Corp.,* 325 F.3d 586, 597–98 (5th Cir.2003); *World Championship Wrestling v. Titan Sports, Inc.,* 46 F.Supp.2d 118, 122 (D.Conn.1999);

*BMW of N. Am., Inc. v. Au–tomotive Gold, Inc.,* No. 96–384–CIV–J–20, 1996 WL 1609124, at *3 (M.D.Fla. June 19, 1996). The Court finds no reason to differentiate between the two claims for standing purposes and therefore considers its standing analysis to cover both claims.

Co., 2001 WL 1456577, at *5; (4) the licensing agreement requires the licensee to maintain the quality of the mark or reserves to the licensor the right to monitor the quality of the licensee's products, *see id.* at *5; *Gruen Mktg. Corp. v. Benrus Watch Co.*, 955 F.Supp. 979, 983 (N.D.Ill. 1997); (5) the license contains duties and rights between the parties that are inconsistent with an assignment, *see Fin. Inv. Co. (Bermuda) Ltd.*, 165 F.3d at 532; and (6) the license limits the licensee's ability to enforce the mark against infringers, *STX, Inc. v. Bauer USA, Inc.*, No. C 96–1140 FMS, 1997 WL 337578, at *3 (N.D.Cal. June 5, 1997). On the other hand, a licensee will have standing where the agreement transfers to the licensee all of the licensor's rights in the use of the trademark, *see Etri, Inc. v. Nippon Miniature Bearing Corp.*, No. 85 C 615, 1989 WL 99575, at *3 (N.D.Ill. Aug. 18, 1989), or where the agreement grants the licensee exclusive use of the mark without restricting the licensee's ability to enforce the mark, *see Ultrapure Sys., Inc.*, 921 F.Supp. at 665–66.

■ With regard to the license of the Torc–Pac mark, the Settlement Agreement grants to BCN/Clearing "the exclusive and perpetual right and license to utilize the Proprietary Rights ... to ... design, engineer, manufacture, service, maintain, repair, rebuild, retrofit, use and sell Clearing Machines and Parts throughout the world and the right to sublicense such rights," subject to certain rights reserved by CSI. (Settlement Agreement § 2.3.) The Settlement Agreement also emphasizes that CSI retains its ownership interest in the mark: "The Verson Parties [Clearing] acknowledge that the Hitachi Parties [CSI] are and shall remain the exclusive owners of all Proprietary Rights." (*Id.* § 2.1.) Section 2.6 grants BCN/Clearing the right to grant sublicenses, but that right is subject

to various restrictions. For example, a non-affiliate sublicensee may not grant sublicenses; BCN/Clearing must provide immediate notice to CSI when it enters into a sublicense; and BCN/Clearing may not grant a sublicense to a non-affiliate in the United States, England, or Japan without the prior written consent of CSI. (*Id.* § 2.6(i), (iii), and (iv).) Section 2.15 reserves to CSI "the continuing right in perpetuity to utilize the Proprietary Rights" and to license others to utilize the Proprietary Rights with regard to "HZC Machines," but neither CSI nor its affiliates and licensees has the right to grant any licenses or sublicenses with regard to Torc–Pac clutch equipment or to manufacture Clearing Machines and Parts. (*Id.* § 2.15(ii), (iii).) BCN/Clearing is required to make royalty payments to CSI, and BCN/Clearing's failure to make such payments constitutes an event of default, entitling CSI to terminate the license. (*Id.* §§ 2.4, 2.7.) BCN/Clearing has no further right to use the mark in the event the license is terminated. (*Id.* § 2.10.) Finally, the Settlement Agreement designates CSI as the party responsible for maintaining all registrations of the trademarks and provides that BCN/Clearing "will cooperate with and assist CSI in reestablishing CSI's ownership rights" in any trademarks for which the registrations have expired. (*Id.* § 2.18.) CSI is not required to initiate any actions with regard to alleged infringement of the trademarks, but BCN/Clearing has the right to pursue any infringement actions at its own expense. In the event BCN/Clearing decides to pursue an infringement action, CSI is required to "sign all documents and provide such other assistance" as BCN/Clearing may request. (*Id.*)

Based upon the foregoing provisions, the Court concludes that BCN/Clearing's interest as an exclusive licensee of the Torc–Pac mark is sufficient to confer standing

on BCN /Clearing to maintain its infringement and dilution claims. BCN/Clearing has an exclusive and perpetual right and license to use the Torc–Pac mark "throughout the world" as well as the right to pursue actions for infringement of the mark. In addition, the license at issue lacks many of the features indicative of a license agreement—for example, quality control provisions and geographical limitations (although Midwest asserts that there are such limitations, the scope of the license is "throughout the world" and the Court has not found any exceptions to this coverage). Thus, even though the Settlement Agreement states that CSI retains ownership of the mark, BCN/Clearing has substantial rights in the mark, including the right to enforce those rights against third parties. *See Ultrapure Sys., Inc.,* 921 F.Supp. at 665–66 (concluding that the licensee had standing where the licensee had the exclusive use of the trademarks in the United States and the agreement did not limit the licensee's ability to enforce the trademarks); *Shoney's Inc. v. Schoenbaum,* 686 F.Supp. 554, 563 (E.D.Va.1988) (concluding that because the licensee had the exclusive right to use the trademarks within the licensed territory and the agreement contained a provision for cooperation between the licensor and the licensee for protecting the mark, the licensee had "some rights to protect"). The standing argument is therefore rejected.

### 2. Limitations, Laches, and Acquiescence

Midwest next contends that BCN/Clearing's Lanham Act claims are untimely because they were filed beyond the applicable limitations period or are barred by the doctrines of laches and acquiescence.

In determining whether a plaintiff asserted his Lanham Act claim in a timely manner, courts apply the equitable doctrine of laches because the Lanham Act does not contain a statute of limitations. *Tandy Corp. v. Malone & Hyde, Inc.,* 769 F.2d 362, 365 (6th Cir.1985). The doctrine of laches requires proof of unreasonable delay by the party seeking to enforce its trademark rights and material prejudice to the alleged infringer. *Kellogg Co. v. Exxon Corp.,* 209 F.3d 562, 569 (6th Cir.2000). In the Sixth Circuit, "there is a strong presumption that a plaintiff's delay in asserting its rights is reasonable as long as an analogous state statute of limitations has not elapsed." *Nartron Corp. v. STMicroelectronics, Inc.,* 305 F.3d 397, 408 (6th Cir.2002) (citing *Elvis Presley Enter., Inc. v. Elvisly Yours, Inc.,* 936 F.2d 889, 894 (6th Cir.1991)). The applicable period in this case is Michigan's three-year limitation period for injury to personal property under M.C.L. § 600.5805(8). *Id.* "The period of delay begins to run when plaintiff had actual or constructive knowledge of the alleged infringing activity." *Id.* (internal quotation marks omitted).

Midwest argues that BCN/Clearing's complaint, filed on April 25, 2002, was beyond the three-year limitations period. Midwest cites several reasons why BCN/Clearing had actual or constructive knowledge of Midwest's use of the Torc–Pac mark prior to April 25, 1999. Midwest points out that it was using the Torc–Pac mark on its website and in its brochures to identify its replacement parts in February of 1999. Midwest also notes that it has sold Torc–Pac parts to mutual customers since at least as early as 1996 and has submitted an invoice from a 1998 sale to General Motors that bears the Torc–Pac mark. Finally, Midwest points out that Clearing purchased Torc–Pac parts from Midwest in August of 1998.

Midwest's evidence fails to show that BCN/Clearing had actual or constructive

knowledge of Midwest's use of the Torc–Pac mark prior to April 25, 1999. The fact that Clearing purchased Torc–Pac parts from Midwest in August of 1998 is insignificant because Midwest fails to explain why such purchases should have alerted Clearing to the fact that Midwest was using the Torc–Pac mark. The invoices Midwest sent to Clearing did not contain the Torc–Pac mark, and Midwest's assertion that Clearing, as a Midwest customer, could have asked for Midwest's product literature is specious in light of Midwest's own admission that it did not actually begin using the Torc–Pac mark until February of 1999. Similarly, other than noting that Clearing and Midwest cater to the same customers in the automotive industry, Midwest fails to provide any reasonable explanation why Midwest's invoices to third-party customers should have put Clearing on notice that Midwest was using the Torc–Pac mark. In addition, Midwest's assertion that Clearing should have known about Midwest's use of the Torc–Pac mark on its website and on its marketing brochures in February 1999 must be rejected because there is no evidence to show that Clearing had any reason to know that Midwest was using the Torc–Pac mark. In fact, BCN/Clearing's evidence shows that in September or October of 2000, when it did learn that Midwest was using the Torc–Pac mark, it took prompt action to protect its rights by inquiring about Midwest's use of the mark. Moreover, Midwest has failed to offer any real evidence that it has suffered prejudice as a result of the alleged delay.

 Midwest also contends that BCN/Clearing is estopped from seeking injunctive relief in this case. However, in order to establish estoppel, the party asserting the defense must show affirmative misconduct or intentional silence "amounting to a virtual abandonment of the trademark." *Kellogg Co.*, 209 F.3d at 574. Midwest has failed to demonstrate such conduct by Clearing. Midwest's assertion that a lack of objections by Clearing's customers to Midwest's use of the Torc–Pac mark somehow shows acquiescence by Clearing makes no sense and is rejected.

Finally, the cases Midwest cites in support of its assertion that BCN/Clearing had a duty to inquire about Midwest's use of the Torc–Pac mark do not support Midwest's position. For example, in *Armco, Inc. v. Armco Burglar Alarm Co.*, 693 F.2d 1155 (5th Cir.1982), the plaintiff knew that the defendant was using the name "Armco" as early as 1970 but did not file suit until 1978. Although a tracing service was unable to locate the defendant company in 1970, there was no dispute that the defendant was conducting business at that time using the telephone number and address listed in the directory. *Id.* at 1157–58. Here, as discussed above, there is no evidence showing that Clearing knew or had reason to know that Midwest was using the Torc–Pac mark. What Midwest really advocates is a duty of paranoia, not a duty of inquiry. This is not the law.

### 3. Fair Use Defense

 Midwest contends that its use of the Torc–Pac mark constituted a "fair use" of the mark. The fair use defense applies if the defendant's use was "a use, otherwise than as a mark, ... which is descriptive of and used fairly and in good faith only to describe the goods of such party." 15 U.S.C. § 1115(b)(4). "Under the doctrine of 'fair use,' the holder of a trademark *cannot* prevent others from using the word that forms the trademark in its *primary* or *descriptive* sense." *Herman Miller, Inc. v. Palazzetti Imports & Exports, Inc.*, 270 F.3d 298, 319 (6th Cir. 2001). "[F]air use permits others to use a protected mark to describe aspects of their

own goods." *Car–Freshner Corp. v. S.C. Johnson & Son, Inc.,* 70 F.3d 267, 270 (2d Cir.1995). In considering a fair use defense, a court should consider whether the defendant has used the mark: (1) in its descriptive sense; and (2) in good faith. *ETW Corp. v. Jireh Publ'g, Inc.,* 332 F.3d 915, 920 (6th Cir.2003) (citing *Victoria's Secret Stores v. Artco Equip. Co.,* 194 F.Supp.2d 704, 724 (S.D.Ohio 2002)).

 In what is often referred to as nominative fair use, a defendant uses the plaintiff's mark to describe the plaintiff's product rather than its own. *New Kids on the Block v. News Am. Publ'g Inc.,* 971 F.2d 302 (9th Cir.1992). An example is found in *Volkswagenwerk Aktiengesellschaft v. Church,* 411 F.2d 350 (9th Cir. 1969), where an automobile repair business specializing in the repair of Volkswagen and Porsche vehicles placed a large sign on the front of its premises stating "Modern Volkswagen Porsche Service". *Id.* at 351. "Volkswagen" was the registered mark of the plaintiff. *Id.* Midwest contends that its use of the Torc–Pac mark was fair use in this sense: it only used the Torc–Pac mark to designate the replacement parts it made for Torc–Pac–type clutches. In other words, Midwest contends that its use of the mark was not deceptive because its use only indicated the fact that it was providing replacement parts and repair services (including rebuilt units) for the Torc–Pac 40.

BCN/Clearing does not dispute Midwest's claim that its use of the Torc–Pac mark to indicate that it provides replacement parts and services for Torc–Pac units would not be improper. However, BCN/Clearing argues that Midwest improperly used the Torc–Pac mark to induce BCN/Clearing customers and potential customers into believing that Midwest sells authentic Torc–Pac 40 units and parts. BCN/Clearing's evidence supports its claim. That evidence shows that in 1999 and 2000, Midwest used the Torc–Pac mark in a manner indicating that Midwest was selling authentic Torc–Pac units and parts. For example, in a bulletin issued in 1999, Midwest stated that it had a "first class Torc–Pac program, including new units, exchange units, parts and services." Other Midwest bulletins featured a photograph of a Torc–Pac 40 unit along with the statements: "Repairs, New Units; Exchange Units; Quality Inspected Parts," and "Wet Clutch/Brakes for New & Retrofit Applications." Some of Midwest's marketing materials showed a Torc–Pac 40 in conjunction with statements indicating that Midwest had "new units available." In a 1999 customer newsletter, Midwest stated: "We intend to focus on what we know best—our core products [including] TORC–PAC drives—our popular and dependable wet-clutch drives." Midwest also identified its replicas of the Torc–Pac 40 as "Torc–Pac 40(New)" on its invoices. This evidence refutes Midwest's fair use defense because it shows that Midwest was not simply using the Torc–Pac mark in a descriptive manner, but instead was using the mark to represent that it was selling new Torc–Pac 40 units. This is not a fair use of the Torc–Pac mark.

### 4. Likelihood of Confusion

 Midwest also argues that it is entitled to summary judgment on BCN/Clearing's infringement and false designation of origin claims because BCN/Clearing cannot show a likelihood of confusion, as is required for such claims. The Sixth Circuit employs an eight-factor analysis in determining whether the defendant's use of the plaintiff's mark created a likelihood of confusion: (1) strength of the plaintiff's mark; (2) relatedness of the goods or services; (3) similarity of the marks; (4) evidence of actual confusion;

(5) marketing channels used; (6) likely degree of purchaser care and sophistication; (7) the defendant's intent in selecting the mark; and (8) likelihood of expansion of the product lines using the marks. *Frisch's Rests., Inc. v. Shoney's Inc.,* 759 F.2d 1261, 1264 (6th Cir.1985)(citing *Frisch's Rests., Inc. v. Elby's Big Boy of Steubenville, Inc.,* 670 F.2d 642, 648 (6th Cir.1982)). These factors do not represent a precise formula for determining whether confusion may exist but should be considered in light of the specific facts and circumstances in each case. *Homeowners Group, Inc. v. Home Mktg. Specialists, Inc.,* 931 F.2d 1100, 1107 (6th Cir.1991). "The ultimate question remains whether relevant consumers are likely to believe that the products or services offered by the parties are affiliated in some way." *Id.*

Initially, Midwest contends that the Court need not resort to the eight-factor analysis because BCN/Clearing's Rule 30(b)(6) witness, Karen Adams, admitted that there is no likelihood of confusion because customers would know the identity of the Torc–Pac 40 seller, Midwest, and would thus have no reason to believe that they were buying the Torc–Pac 40 from Clearing. This argument misses the point, because the issue is whether customers would believe that they were buying an authentic Clearing Torc–Pac 40, not a replica. Moreover, Ms. Adams testified that "[t]he Torc–Pac name is used almost synonymously in the industry with . . . Clearing's trade name." (Adams Dep. at 127, Pl.'s Br. Opp'n Def.'s First Mot. Ex. 26.) Ms. Adams also stated: "We own the rights to the Clearing and the Torc–Pac trade names. We are the exclusive owner, and, therefore, it would be confusing for anyone to think that someone else is selling the Torc–Pac name or selling Torc–Pacs." (*Id.*) Similarly, Midwest's argument that BCN/Clearing has failed to identify a single instance of actual confusion is irrelevant, because, as noted below, the concern here is potential, not actual, confusion. Therefore, the Court will address each of the relevant considerations.

### a. Strength of the Plaintiff's Mark

The protection accorded a mark under the Lanham Act depends upon the "strength" of the mark. *See Qualitex Co. v. Jacobson Prods. Co.,* 514 U.S. 159, 167, 115 S.Ct. 1300, 1305, 131 L.Ed.2d 248 (1995). A mark's "strength" is gauged by its "distinctiveness and degree of recognition in the marketplace." *Homeowners Group, Inc.,* 931 F.2d at 1107. " 'A mark is strong if it is highly distinctive, i.e., if the public readily accepts it as the hallmark of a particular source; it can become so because it is unique, because it has been the subject of wide and intensive advertisement, or because of a combination of both.' " *Frisch's Rest.,* 759 F.2d at 1264 (quoting Callman, *Unfair Competition, Trademarks & Monopolies,* ¶ 20.43 (4th ed.1983)).

The initial task in determining the strength of a mark is to place it in one of four categories which provide a range of protection: generic, descriptive, suggestive, and fanciful or arbitrary. *Daddy's Junky Music,* 109 F.3d at 280. Fanciful or arbitrary marks, such as CAMEL cigarettes or APPLE computers, are the strongest and most distinctive marks. *Id.* Generic and descriptive marks, which describe the product or aspects of the product, are on the other end of the spectrum and are not entitled to trademark protection unless they have acquired secondary meaning. *Boustany v. Boston Dental Group, Inc.,* 42 F.Supp.2d 100, 105 (D.Mass.1999). A mark's strength is not entirely dependent upon the category into which it falls. An arbitrary mark may

deserve limited protection where it "ha[s] little customer recognition or 'strength' in the market, or perhaps ha[s] high recognition which is limited to a particular product or market segment." *Homeowners Group*, 931 F.2d at 1107. Thus, evidence concerning market recognition is highly relevant in assessing the strength of a mark. *See Frisch's Rest.*, 759 F.2d at 1265.

■ Midwest argues that the Tor–Pac mark is very weak because it has become descriptive of wet clutches in the manufacturing industry. Midwest cites Adams' acknowledgment that "Torc–Pac is used as a noun to describe a wet clutch." (Adams Dep. at 133.) Midwest also contends that Adams admitted that the name "Torc–Pac" is descriptive of the product's function. In addition, Midwest notes that Clearing has used the Torc–Pac name as descriptive of wet clutches without any assertion of it being a registered trademark and that other entities, such as machine repair businesses, have used the Torc–Pac name or variations of it in their marketing literature.

Midwest's arguments must be rejected, because the evidence shows that Torc–Pac is not simply a descriptive term for any wet clutch used in the industry, but instead describes the particular wet clutch that is used in Clearing presses. Adams testified that BCN/Clearing uses the Torc–Pac 40 wet clutch in the Clearing press and that "[n]one other than a Clearing press owner typically has a Torc–Pac in their press." (Adams Dep. at 154.) In fact, Midwest's own representative, James Taylor, Jr., admitted that the Torc–Pac wet clutch is not interchangeable with other wet clutches. (Taylor, Jr. Dep. I at 278–79, Pl.'s Br. Opp'n Def.'s First Mot. Ex. 27.) Moreover, Adams did not agree that the Torc–Pac name was merely descriptive of the machine's function, and the

Court agrees with BCN/Clearing that the name does not adequately describe the two functions of transferring torque to the moving parts of the press and applying the brake to decelerate those parts. Finally, the evidence of use of the name by other entities is not persuasive, because those businesses only used the name to describe their repair services for Torc–Pac clutch units, not to promote the sale of new Torc–Pac units and replacement parts.

Although the mark is more suggestive than fanciful or arbitrary, the Court concludes that it is a strong mark. The evidence shows that the Torc–Pac mark has been in use for years, is widely associated with Clearing and Clearing presses, and connotes the particular wet clutch manufactured by Clearing. Thus, the Torc–Pac has not become merely a noun used to describe any wet clutch as Midwest asserts.

#### b. *Relatedness of the Goods*

With regard to the relatedness factor, cases usually fall into one of three categories:

> (1) direct competition of services, in which case confusion is likely if the marks are sufficiently similar; (2) services are somewhat related but not competitive, so that likelihood of confusion may or may not result depending on other factors; and (3) services are totally unrelated, in which case confusion is unlikely.

*Homeowners Group*, 931 F.2d at 1108. The goods in this case fall into the same category because they directly compete: BCN/Clearing's Torc–Pac 40 clutch and Midwest's Torc–Pac 40 clutch. Thus, this factor suggests a likelihood of confusion.

#### c. *Similarity of the Marks*

■ In evaluating the similarity of the marks, a court should not make a side-by-

side comparison but "[i]nstead ... must determine, in the light of what occurs in the marketplace, whether the mark 'will be confusing to the public when singly presented.'" *Wynn Oil Co.*, 839 F.2d at 1187 (quoting *Beer Nuts, Inc. v. Clover Club Foods Co.*, 711 F.2d 934, 941 (10th Cir. 1983)). A proper analysis of this factor "includes examining the pronunciation, appearance, and verbal translation of conflicting marks." *Id.* at 1188. The marks in this case are exactly the same. Therefore, this factor suggests that confusion is likely to occur.

### d. *Evidence of Actual Confusion*

 "Evidence of actual confusion is undoubtedly the best evidence of likelihood of confusion." *Wynn Oil Co.*, 839 F.2d at 1188. However, such evidence is not always entitled to significant weight. For example, evidence of actual confusion is less significant where the parties have competed in the same area for a several of years with only a few incidents of confusion. *Homeowners Group, Inc.*, 931 F.2d at 1110. Moreover, " '[s]hort-lived confusion or confusion of individuals casually acquainted with a business is worthy of little weight,' while chronic mistakes and serious confusion of actual customers are worthy of greater weight." *Id.* (citation omitted) (quoting *Safeway Stores, Inc. v. Safeway Discount Drugs, Inc.*, 675 F.2d 1160, 1167 (11th Cir.1982)).

 Midwest contends that there is no evidence of actual confusion, but BCN/Clearing disputes this assertion, citing statements by Dave Stroner, BCN/Clearing's Regional Account Manager. According to Stroner, one of BCN/Clearing's customers located in Mexico told Stroner that Midwest was selling new Torc–Pac 40 component parts and also stated his belief that Midwest's parts were identical to BCN/Clearing's Torc–Pac 40

parts, with the exception of price. (Stroner Aff. ¶ 26, Pl.'s Br. Opp'n Def.'s First Mot. Ex. 17.) Stroner adds that the customer believed that the Midwest parts were authentic Torc–Pac parts. Midwest argues that this evidence is of little consequence. *Playboy Enterprises, Inc. v. Chuckleberry Publishing, Inc.*, 687 F.2d 563 (2d Cir.1982), which Midwest cites in support of this contention, stated that a lack of actual confusion in a foreign country (Italy) would have limited probative value in determining likelihood of confusion in the United States because it is a different market. *Id.* at 569. This case is not entirely apposite, however, because here the evidence tends to show some actual confusion and there is a difference in that Mexico is not as removed from the United States market as Italy and the Mexican customer was dealing directly with two United States companies. Nonetheless, the Court declines to give this evidence much weight because it is an isolated instance. Because the Lanham Act is concerned with potential and not actual confusion, however, even a total lack of evidence of actual confusion is not fatal to BCN/Clearing's claim. *See Mktg. Displays, Inc. v. TrafFix Devices, Inc.*, 200 F.3d 929, 935 (6th Cir.1999).

### e. *Marketing Channels Used*

 A court should consider whether the parties' marketing efforts are similar or different and whether their marketing efforts are designed to reach the same customer base. *Daddy's Junky Music Stores*, 109 F.3d at 285.

Obviously, dissimilarities between the predominant customers of a plaintiff's and defendant's goods or services lessens the possibility of confusion, mistake, or deception. Likewise if the services of one party are sold through different marketing media in a different context

than those of another seller, the likelihood that either group of buyers will be confused by similar service marks is much lower than if both parties sell their services through the same channels of trade.

*Homeowners Group,* 931 F.2d at 1110.

■■■ Midwest concedes that both parties sell their products to a similar set of customers, but contends that they do not share a common marketing channel.[5] This argument must be rejected, because the fact that Midwest and BCN/Clearing sell to essentially the same customers is indicative of similar marketing channels. *See Mexican Food Specialties, Inc. v. Festida Foods, Ltd.,* 953 F.Supp. 846, 852 (E.D.Mich.1997).

#### f. *Likely Degree of Purchaser Care*

■■■ In general, the standard to be applied in determining whether this factor indicates the potential for confusion is "the typical buyer exercising ordinary caution." *Homeowners Group,* 931 F.2d at 1111. A higher standard may be required where the buyer has more expertise or where the product is more expensive, such as a house, because the purchaser is more likely to exercise a higher degree of care. *Id.* "The ultimate significance of a given degree of care, however, often will depend upon its relationship with the other seven factors." *Daddy's Junky Music Stores,* 109 F.3d at 285.

■■■ Midwest argues that because the Torc–Pac clutch is an intricate and expensive piece of machinery, the ordinary purchaser of the product will be a highly sophisticated user, well-versed in technology and industry. However, even where the buyer is highly sophisticated, confusion

may be likely where the marks are confusingly similar because the purchaser may believe that the seller and its product are affiliated with the other party. *See Daddy's Junky Music,* 109 F.3d at 286. Here, as noted, the marks were identical, which could easily lead to consumer confusion. In addition, as is evident from BCN/Clearing's history, the press manufacturing industry has seen its share of reorganization and it is possible that a customer would not know which company is the OEM manufacturer for Clearing press parts.

#### g. *Intent of Defendant*

■■■ This factor is relevant if a party chooses a mark with the intent of causing confusion. If such is the case, that fact by itself may be sufficient to support an inference of confusing similarity. *Wynn Oil,* 839 F.2d at 1189. Direct evidence of intentional copying is not necessary to prove intent. *Daddy's Junky Music Stores,* 109 F.3d at 286. "Rather, the use of a contested mark with knowledge of the protected mark at issue can support a finding of intentional copying." *Id.*

This factor tends to show a likelihood of confusion. Midwest argues that it only used the Torc–Pac mark to advertise its repair business, but as already noted, Midwest used the Torc–Pac mark in connection with its sale of parts and new wet clutch units. Moreover, although Midwest may have attributed the Torc–Pac mark to BCN/Clearing in its 2001 literature, it apparently began to do so only after receipt of the letter from BCN/Clearing's counsel.

#### h. *Expansion of Product Line*

■■■ "[A] 'strong possibility' that either party will expand his business to compete with the other or be marketed to the

---

**5.** Midwest cites Exhibit O to its brief in support of this statement, at pages 152–53. However, that exhibit consists of only two pages, contains no page numbers corresponding to the site, and does not support Midwest's point.

same consumers will weigh in favor of finding that the present use is infringing." *Homeowners Group, Inc.*, 931 F.2d at 1112 (quoting *Restatement of Torts* § 731(b) & comment c (1938)). Midwest contends that this factor does not support a likelihood of confusion because the Torc–Pac business is generally in decline. While this may be true for the sale of new Torc–Pac units, there will still be a demand for Torc–Pac replacement parts well into the future.

### i. Conclusion Regarding Likelihood of Confusion

The factors set forth above, considered in their totality, strongly suggest a likelihood of confusion arising from Midwest's use of the Torc–Pac mark. In fact, although BCN/Clearing has not moved for summary judgment on this point, BCN/Clearing would have a substantial basis for such a motion. In any event, Midwest has failed to show that it is entitled to summary judgment with regard to the likelihood of confusion.

### 5. Actual Confusion—Dilution Claim

Midwest contends that it is entitled to summary judgment on BNC/Clearing's dilution claim because BCN/Clearing has admitted that it has no evidence of actual confusion. Midwest then rolls this assertion into the Supreme Court's holding in *Moseley v. V. Secret Catalogue, Inc.*, 537 U.S. 418, 123 S.Ct. 1115, 155 L.Ed.2d 1 (2003), that proof of *actual dilution* is required in order to prove a claim under the Federal Trademark Dilution Act ("FTDA"). *Id.* at 433–34, 123 S.Ct. at 1124–25. This argument is easily rejected for two reasons. First, the argument is misleading because it improperly assumes that confusion and dilution are either interchangeable or are that they are both

elements of a dilution claim, both of which are wrong.

The FTDA protects the holder of a trademark from dilution, which is different from, and broader than, infringement in that neither confusion nor competition is required and the protection is nationwide in scope. Dilution is "the lessening of the capacity of a famous mark to identify and distinguish goods or services, regardless of the presence or absence of—(1) competition between the owner of the famous mark and other parties, or (2) likelihood of confusion, mistake, or deception."

*Nissan Motor Co. v. Nissan Computer Corp.*, 378 F.3d 1002 (9th Cir.2004) (citation omitted) (quoting 15 U.S.C. § 1127). *See also I.P. Lund Trading ApS v. Kohler Co.*, 163 F.3d 27, 43 n. 9 (1st Cir.1998) ("We note again that the test for dilution is different and does not require a showing of confusion."); *Victoria's Secret Stores v. Artco Equip. Co.*, 194 F.Supp.2d 704, 730 (S.D.Ohio 2002) (stating that "defendants' argument that no actual confusion exists, even if true, does not provide a meritorious defense for their actions"). Second, Midwest apparently failed to read the portion of the *Moseley* opinion where the Court observed that "direct evidence of dilution such as consumer surveys will not be necessary if actual dilution can reliably be proved through circumstantial evidence—the obvious case is one where the junior and senior marks are identical," *Moseley*, 537 U.S. at 434, 123 S.Ct. at 1125, which is precisely the case here. *See also Am. Honda Motor Co. v. Pro–Line Protoform*, 325 F.Supp.2d 1081 (C.D.Cal.2004) (stating that "when identical marks are used on similar goods, dilution—the capacity of the famous mark to identify and distinguish the goods of the trademark holder—obviously occurs"); *Gen. Motors Corp. v. Autovation Techs., Inc.*, 317 F.Supp.2d 756, 764 (E.D.Mich.2004) ("GM has presented reli-

able, circumstantial proof of actual dilution. GM's evidence establishes actual dilution in that Defendant has used marks that are identical to the world-famous GM Trademarks.").

## B. MUTSA Claim

In its Second Motion, Midwest argues that it is entitled to summary judgment on BCN/Clearing's trade secret misappropriation claim under MUTSA set forth in Count IV. As noted above, in its earlier Opinion, this Court concluded that BCN/Clearing's common law trade secret misappropriation claim was filed beyond the three-year limitations period and that the discovery rule did not apply to that claim. Midwest argues in this motion that BCN/Clearing has no claim under MUTSA because BCN/Clearing alleges that Midwest began misappropriating BCN/Clearing's trade secret relating to the Torc–Pac 40 engineering drawings before MUTSA was enacted. BCN/Clearing concedes that it has no claim under MUTSA. However, it requests that the Court reconsider its prior ruling and hold that the discovery rule applies. In addition, BCN/Clearing argues that its claim is timely because Midwest fraudulently concealed facts surrounding Midwest's misappropriation of BCN/Clearing's trade secret.

Although BCN/Clearing has not filed a motion for reconsideration, the Court has reexamined its prior ruling on the issue of the discovery rule in light of the cases and developments cited by BCN/Clearing, including the Texas Legislature's enactment of a statute applying the discovery rule to common law trade secret misappropriation claims following the Texas Supreme Court's decision in *Computer Associates International, Inc. v. Altai, Inc.*, 918 S.W.2d 453 (1996), and concludes that its decision was not based upon "a palpable defect by which the Court and the parties have been [misled]." LCivR 7.4(a). Al-

though there are persuasive arguments on both sides of the issue and decisions going both ways, *see Bausch & Lomb, Inc. v. Alcon Labs., Inc.*, 64 F.Supp.2d 233, 246 (W.D.N.Y.1999) (declining to apply the discovery rule to misappropriation of trade secret claims under New York law), and *Prescott v. Morton Int'l, Inc.*, 769 F.Supp. 404, 408 (D.Mass.1990) (applying the discovery rule to a trade secrets claim under Massachusetts law), the Court is not persuaded that its prior decision was incorrect.

The Court also rejects BCN/Clearing's fraudulent concealment argument because a plaintiff must affirmatively allege in its complaint facts giving rise to fraudulent concealment. *See City of Detroit Pension Fund v. Prudential Secs., Inc.*, 91 F.3d 26, 30 (6th Cir.1996) (noting that the plaintiffs failed to adequately plead fraudulent concealment before the district court). Moreover, a "party alleging fraudulent concealment must plead the circumstances giving rise to it with particularity" as required by Rule 9(b). *Ames v. Texaco, Inc.*, 758 F.2d 652, 1985 WL 12931, at *2 (6th Cir.1985). Here, BCN/Clearing's complaint not only fails to meet the requirements of Fed. R.Civ.P. 9(b), it wholly omits any reference to fraudulent concealment. Finally, the Court notes that BCN/Clearing has never moved to amend its complaint to allege fraudulent concealment.

## C. Breach of Contract (Count V)

Midwest contends that summary judgment is proper on BCN/Clearing's breach of contract claim because the claim is barred by Michigan's six-year statute of limitations for breach of contract actions. Midwest argues that the claim accrued more than six years prior to April 25, 2002—the date BCN/Clearing filed its complaint—because BCN/Clearing high-

lighted a change made by Midwest on March 18, 1996, on the drawings BCN/Clearing supplied to Midwest during discovery to indicate the trade secrets BCN/Clearing claims Midwest misappropriated. As an alternative argument, Midwest argues that any breach of the January 23, 1996, Confidentiality Agreement would have occurred prior to February 23, 1996—the date that Midwest claims to have delivered the drawings to its counsel—because Midwest did not have access to the drawings after that date to copy them or to use the information they contained.

■ The statute of limitations for a breach of contract action in Michigan is six years. M.C.L. § 600.5807(8); *see also Santino v. Provident Life & Accident Ins. Co.*, 276 F.3d 772, 776 (6th Cir.2001). A claim for breach of contract accrues on the date of the breach. *City of Wyandotte v. Consol. Rail Corp.*, 262 F.3d 581, 589 (6th Cir.2001). *See also Blazer Foods, Inc. v. Rest. Props., Inc.*, 259 Mich.App. 241, 245–46, 673 N.W.2d 805, 809 (2003) (stating that "this Court has generally held that a cause of action for breach of contract accrues when the breach occurs, i.e., when the promisor fails to perform under the contract").[6] Thus, BCN/Clearing's breach of contract claim is timely only if the breach occurred within six years of April 25, 2002.

With regard to Midwest's first argument, that BCN/Clearing has admitted that its claim accrued on March 18, 1996, Midwest is correct that BCN/Clearing identified the change Midwest made to its drawings on that date as representing information taken from BCN/Clearing's drawings. In fact, the initial set of drawings BCN/Clearing provided to Midwest during discovery shows that Schlachter highlighted in yellow the March 18, 1996, change, identified by the letter "B," in both the revision summary table and in the body of the drawing. (1st Set of Midwest Drawings at M000237, Pl.'s Br. Opp'n Def.'s Third Mot. Ex. C.) While this evidence, alone, might be sufficient to show that BCN/Clearing's claim is untimely, Schlachter stated in his deposition that he misunderstood his assignment and highlighted *all* changes made on Midwest's drawings after January 1996, regardless of whether they incorporated information from BCN/Clearing's drawings. (Schlachter Dep. at 92–94, Def.'s Br. Supp. Fourth Mot. Ex. 9.) Schlachter then prepared another set of highlighted drawings which identifies the same information as set forth in the first set of drawings but does not highlight the dates of the change in the revision summary table or the letter in the body of the drawing corresponding to the change date. In his affidavit, Schlachter states that the current version of

6. BCN/Clearing argues that its breach of contract claim accrued only when Midwest used the drawings in a way that actually injured BCN/Clearing, for example, by manufacturing Torc–Pac 40 parts or entire Torc–Pac 40 clutches. In other words, BCN/Clearing asserts that Midwest's mere act of copying the drawings is insufficient to support accrual of the claim. The cases BCN/Clearing cites for this argument are inapposite, because they concerned claims grounded in tort or breach of warranty rather than breach of contract. *See Perreault v. Hostetler,* 884 F.2d 267 (6th Cir.1989) (civil rights claim under 42 U.S.C. § 1983); *Connelly v. Paul Ruddy's Equip. Repair & Service Co.,* 388 Mich. 146, 200 N.W.2d 70 (1972) (negligence); *Stephens v. Dixon,* 449 Mich. 531, 536 N.W.2d 755 (1995) (negligence); *Filcek v. Utica Building Co.,* 131 Mich.App. 396, 345 N.W.2d 707 (1984) (negligent construction and breach of implied warranty). Moreover, BCN/Clearing does not deny that Midwest would breach the Confidentiality Agreement either by actually copying BCN/Clearing's engineering drawings or by transferring the information in those drawings to Midwest's drawings.

Midwest's drawing does not show how the March 18, 1996, revision changed the drawing or whether revision "B" conformed the drawing to BCN/Clearing's drawing. (Schlachter Aff. ¶ 69, Pl.'s Br. Opp'n Def.'s Fourth Mot. Ex. 11.) Schlachter also states that "[t]he highlighting on both the first and second sets of highlighted drawings was intended to represent that Revisions C and D were revisions by which Midwest Brake confirmed its drawings to the Clearing drawings." (*Id.* ¶ 72.) Given Schlachter's explanation for the highlighting on the first set of drawings, the credibility of which is for a jury to decide, the Court concludes that there is a genuine issue of material fact regarding when BCN/Clearing's breach of contract claim accrued that precludes summary judgment on BCN/Clearing's breach of contract claim. *Cf. Hudick v. Hastings Mut. Ins. Co.*, 247 Mich.App. 602, 605–06, 637 N.W.2d 521, 523 (2001) (noting that "[a]bsent disputed questions of fact, whether a cause of action is barred by a statute of limitations is a question of law").[7]

The Court also rejects Midwest's second argument for summary judgment—that Midwest could not have breached the Confidentiality Agreement after February 23, 1996, when it delivered the drawings to its counsel. Midwest supports its motion with an affidavit from its former attorney, Robert D. Watkins, who states that his firm obtained "exclusive possession [of the drawings] on or about February 23, 1996," and that they remained at his firm's offices from that date until they were returned to BCN/Clearing in November 1996. (Watkins Aff. ¶¶ 5—7, Def.'s Br. Supp. Fourth Mot. Ex. 12.) Citing nothing more than Watkins' affidavit, Midwest states that after it delivered the drawings to Watkins' firm, it "did not see, use or possess them again." (Def.'s Br. Supp. Fourth Mot. at 8.) While Watkins' affidavit states that his firm continued to possess the drawings after February 23, 1996, it does not state that Midwest never had or requested access to them. As Midwest's attorney, Watkins was Midwest's agent and would have been obliged to comply with such a request. Thus, Midwest has failed to present sufficient summary judgment evidence to establish that it could not have breached the Confidentiality Agreement after April 25, 1996. Accordingly, the Court will deny this motion for summary judgment.

## D. Counts VI, VII, IX, and X

In its Fifth Motion, Midwest seeks summary judgment on BCN/Clearing's tortious interference, unfair competition, fraud, and accounting claims on various grounds. The Court will address each claim in turn.

### 1. Tortious Interference

In Count VI of its complaint, BCN/Clearing alleges a claim for tortious interference with contractual relations and advantageous business opportunity. To establish a claim for tortious interference with a contract, a plaintiff must allege: (1) the existence of a contract; (2) a breach; and (3) an unjustified instigation of the breach by the defendant. *Mahrle v.*

---

7. Midwest argues that accepting Schlachter's affidavit and testimony would be contrary to the rule set forth in *Reid v. Sears, Roebuck & Co.*, 790 F.2d 453 (6th Cir.1986), that "[a] party may not create a factual issue by filing an affidavit, after a motion for summary judgment, which contradicts her earlier deposition testimony." *Id.* at 460. The Court disagrees, because Schlachter's affidavit does not contradict his prior deposition testimony but instead further explains his prior deposition testimony about why he highlighted the March 18, 1996, change on the initial set of Midwest drawings.

*Danke,* 216 Mich.App. 343, 350, 549 N.W.2d 56, 60 (1996). The elements of tortious interference with a business relationship are: (1) the existence of a valid business relationship or expectancy; (2) knowledge of the relationship or expectancy by the defendant; (3) intentional interference by the defendant which induces or causes a breach or termination of the relationship or expectancy; and (4) damage to the plaintiff. *BPS Clinical Labs. v. Blue Cross & Blue Shield of Mich.,* 217 Mich. App. 687, 698, 552 N.W.2d 919, 925 (1996) (per curiam). A plaintiff seeking to establish a tortious interference claim

> must allege the intentional doing of a per se wrongful act or the intentional doing of a lawful act with malice and unjustified in law for the purpose invading plaintiff's contractual rights or business relationship. Under the latter instance, plaintiff necessarily must demonstrate, with specificity, affirmative acts by the interferer which corroborate the unlawful purpose of the interference.

*Feldman v. Green,* 138 Mich.App. 360, 369–70, 360 N.W.2d 881, 886 (1984) (per curiam). An act does not constitute improper motive or interference "[w]here the defendant's actions were motivated by legitimate business reasons." *BPS Clinical Labs.,* 217 Mich.App. at 699, 552 N.W.2d at 925. "However, where a defendant's actions overreach the bounds of permissible interference and improperly sabotage the contractual agreements of others, a defendant is not immune from liability." *Kavanaugh v. VMC Indus., Inc.,* No. 213219, 2000 WL 33400199, at *3 (Mich.App. Nov. 21, 2000) (per curiam).

▮▮▮▮ BCN/Clearing alleges that Midwest improperly interfered with BCN/Clearing's valid business expectancy (providing new and replacement Torc–Pac 40 units, replacement parts, and repair services to OEM standards to Clearing press owners) by misappropriating BCN/Clearing's trade secrets and by using the Torc–Pac mark on Midwest's sales and marketing materials. The Court previously held that BCN/Clearing's tortious interference claim based upon misappropriation of trade secrets was displaced by MUTSA to the extent that the claim arose after October 1, 1998. *See* 270 F.Supp.2d at 949–50. In addition, the Court held that the discovery rule does not apply to the tortious interference claim, which is subject to a three-year limitations period.[8] *Id.* at 953. Therefore, BCN/Clearing's tortious interference claim based upon misappropriation of trade secrets, to the extent it is not displaced by MUTSA, is barred by the statute of limitations because BCN/Clearing filed its complaint more than three years after the enactment of MUTSA. Moreover, by BCN/Clearing's own admission, the evidence shows that the alleged misappropriation began in late 1996, when Midwest began to incorporate the Torc–Pac 40 information into its own drawings—at least five years before BCN/Clearing filed its complaint in this case. (Schlachter Aff. ¶ 73.)

▮▮▮▮ In its prior opinion the Court held that BCN/Clearing's tortious interference claim would not be barred by MUTSA if the claim were based upon Midwest's use of the Torc–Pac mark and name and if the claim did not accrue more than three years prior to the date BCN/Clearing filed its complaint. Midwest contends that this

---

**8.** As with the trade secret misappropriation claim, BCN/Clearing requests that the Court reconsider its decision that the discovery rule does not apply to the tortious interference claim. The Court declines to do so for the reasons set forth above in connection with the misappropriation claim.

aspect of the tortious interference claim is also barred by the statute of limitations because the evidence, which BCN/Clearing has failed to rebut, shows that the alleged trademark infringement began as early as February 1999. However, this date is not dispositive for purposes of the commencement of the limitations period for the tortious interference claim, because such a claim accrues "at the time all elements, including damages, can be alleged in a proper complaint." *Blazer Foods, Inc. v. Rest. Props., Inc.,* 259 Mich.App. 241, 254, 673 N.W.2d 805, 813 (2003). Thus, BCN/Clearing's claim accrued not when the alleged infringement occurred, but on the date BCN/Clearing suffered damage as a result of the infringement, i.e., when the infringement caused the termination of valid business expectancy BCN/Clearing had with some third party. There is no evidence that this occurred prior to April 25, 1999. By the same token, BCN/Clearing has failed to provide any admissible evidence that Midwest's alleged infringement caused BCN/Clearing to lose any sales for purposes of proving the claim. As mentioned in the discussion above regarding BCN/Clearing's statutory unfair competition claim under the Lanham Act, BCN/Clearing offered the affidavit of Dave Stroner to show that a customer located in Mexico believed that Midwest was selling authentic Torc–Pac 40 parts. This affidavit is insufficient to establish a lost sale for two reasons: (1) it is hearsay and therefore inadmissible; and (2) it fails to show that BCN/Clearing actually lost a sale because of Midwest's alleged confusion. BCN/Clearing also notes that in 2001 Midwest contacted Holland Alloys and JNL–

CNC to be a supplier of Clearing components for the Torc–Pac 40. However, BCN/Clearing fails to explain why or how this evidence regarding a non-customer supplier supports BCN/Clearing's claim or caused BCN/Clearing to lose sales. Accordingly, Midwest is entitled to summary judgment on this claim.

### 2. Unfair Competition

Midwest also contends that it is entitled to summary judgment on BCN/Clearing's common law unfair competition claim for a number of reasons. The Court concludes that summary judgment is proper because the claim is barred by the statute of limitations. As with the tortious interference claim, the Court held in its previous opinion that this claim is displaced by MUTSA to the extent that it is based upon misappropriation of trade secrets occurring after the effective date of MUTSA and that any aspect of the claim not based upon misappropriation of trade secrets is subject to the three-year statute of limitations without the benefit of the discovery rule. *See* 270 F.Supp.2d at 950, 953–54. The aspect of this claim relating to Midwest's infringement of BCN/Clearing's trademark is barred by the statute of limitations because the evidence shows that Midwest began using BCN/Clearing's trademark at least as early as February 1999.[9]

### 3. Fraud

In Count IX, BCN/Clearing alleges that Midwest committed fraud by using BCN/Clearing's trademark in Midwest's sales and marketing materials in order to mislead BCN/Clearing's past, cur-

---

**9.** The limitations analysis for this claim differs from the limitations analysis for the Lanham Act claim because the discovery rule and the continuing wrong doctrine both apply to the Lanham Act claim, *see Island Insteel Sys., Inc. v. Waters,* 296 F.3d 200, 214 n. 8 (3d Cir. 2002), but not to the unfair competition claim under Michigan law, *see Blazer Foods, Inc.,* 259 Mich.App. at 254, 673 N.W.2d at 814 (noting that the continuing wrong "doctrine has been given limited application to trespass, nuisance, and civil rights cases").

rent, and potential customers. (Compl.¶ 72.) BCN/Clearing's fraud claim fails because BCN/Clearing does not allege or offer any evidence that Midwest's materials creating the alleged misrepresentations were directed at BCN/Clearing, with the intent that BCN/Clearing rely upon them, and that BCN/Clearing did in fact rely on them. These are essential requirements for a fraud claim. *Hi–Way Motor Co. v. Int'l Harvester Co.*, 398 Mich. 330, 336, 247 N.W.2d 813, 816 (1976). Moreover, because the alleged fraud was aimed not at BCN/Clearing, but at BCN/Clearing's customers, BCN/Clearing lacks standing to assert the claim as alleged. BCN/Clearing does not dispute these points, but argues instead that the fraud it alleges is Midwest's fraudulent concealment. However, the Court has already concluded that BCN/Clearing has failed to properly allege a claim for fraudulent concealment. Thus, Midwest is also entitled to summary judgment on the fraud claim.

### 4. Accounting

 Midwest is also entitled to summary judgment on BCN/Clearing's accounting claim set forth in Count X. Michigan courts hold that an accounting in equity is unnecessary where discovery is sufficient to determine the amounts at issue. *See Wilson v. Cont'l Dev. Co.*, 112 F.Supp.2d 648, 663 (W.D.Mich.1999). BCN/Clearing has had a full opportunity to obtain discovery from Midwest relative to BCN/Clearing's damages. Moreover, BCN/Clearing's expert has prepared a report which outlines BCN/Clearing's claim for damages. Although BCN/Clearing states that an accounting may be necessary because Midwest has destroyed much of its documents, BCN/Clearing fails to explain why an accounting is necessary in light of the evidence BCN/Clearing has obtained from Midwest. Therefore, the Court will also grant summary judgment on this claim.

### E. Determination of Trade Secret

 In its final motion, Midwest argues that BCN/Clearing's engineering drawings for the Torc–Pac 40 are not trade secrets. Midwest contends that this issue pertains to BCN/Clearing's misappropriation, breach of contract, tortious interference, and unfair competition claims. In light of the Court's determination that the misappropriation, tortious interference, and unfair competition claims are barred by the statute of limitations, the Court need not determine whether BCN/Clearing's drawings constitute a trade secret relative to those claims. As for the breach of contract claim, whether the set of Torc–Pac 40 drawings covered by the Confidentiality Agreement constitutes a trade secret is immaterial to BCN/Clearing's breach of contract claim. In *Kadant, Inc. v. Seeley Machine, Inc.*, 244 F.Supp.2d 19 (N.D.N.Y.2003), the court observed that the plaintiff's breach of contract action could

> lie even in the absence of the customer databases and design specifications being entitled to trade secret protection. [Defendant] signed the confidentiality agreement, so if he disclosed to others or used to his own benefit "private information"—which, for the purposes of this motion, are the design specifications and customer databases—he is in breach of ... his contract....

*Id.* at 39. Similarly, if Midwest used the drawings subject to the Confidentiality Agreement in violation of that agreement, Midwest will be liable for breach of contract. Therefore, the Court will deny this motion.

### IV. *Conclusion*

For the foregoing reasons, the Court will grant summary judgment to Midwest

on BCN/Clearing's misappropriation, tortious interference, unfair competition, fraud, and accounting claims. The case will proceed on BCN/Clearing's trademark, dilution, and statutory unfair competition claims under the Lanham Act and BCN/Clearing's breach of contract claim.

An Order consistent with this Opinion will be entered.